CIENEGA GARDENS, Claremont Village Commons, Covina West Apartments, Del Amo Gardens, Del Vista Village, Desoto Gardens, Las Lomas Gardens, Oxford Park, Parthenia Townhomes, Pioneer Gardens, Puente Park Apartments, Rayen Park Apartments, Reseda Park Apartments, Roscoe Park Apartments, San Jose Gardens, Sunland Park Apartments, Kittridge Gardens I, Kittridge Gardens II, Argonaut Apartments, Beck Park Apartments, Blossom Hill Apartments, Casa San Pablo, Central Park Apartments, Drehmoor Apartments, Fairview Green Apartments, Genessee Park Apartments, Grace & Laughter Apartments, Green Hotel, Hollywood Knickerbocker Apartments, Hollywood Plaza, Kings Canyon Apartments, Lawrence Road Apartments, Livermore Gardens, Palo Alto Gardens, Placita Garden Apartments, Skyline View Gardens, Villa Fontana and Village Green, Plaintiffs,

and

Sherman Park Apartments, Independence Park Apartments, Pico Plaza Apartments and St. Andrews Gardens, Plaintiffs Cross–Appellants,

v.

UNITED STATES, Defendant–Appellant.

Nos. 97–5126, 97–5134.

United States Court of Appeals,
Federal Circuit.

Dec. 7, 1998.

Everett C. Johnson, Jr., Latham & Watkins, Washington, DC, argued for plaintiffs cross-appellants. With him on the brief were Richard P. Bress, Leonard A. Zax, Washington, DC; and Susan S. Azad, Los Angeles, California.

John E. Kosloske, Senior Trial Counsel, Commercial litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief were Carole W. Wilson, Associate General Counsel, Angelo Aiosa, Assistant General Counsel, and Kathleen Burtschi, Attorney, Litigation Division, Office of General Counsel, Department of Housing and Urban Development, Washington, DC.

Susan Hegal, Cambridge and Somerville Legal Services, Cambridge, Massachusetts, for amicus curiae Cambridge Economic Opportunity, Inc. Margaret F. Turner, Greater Boston Legal Services, Boston, Massachusetts, for amicus curiae Boston Affordable Housing Coalition, Inc. James R. Grow, National Housing Law Project, Oakland, California, for amicus curiae National Alliance of HUD Tenants, Inc. Roderick T. Field, Los Angeles Housing Law Project, Los Angeles, California, for amicus curiae Inquilinos Unidos. Chancela Al–Mansour and R. Mona Tawatao, San Fernando Valley Neighborhood Legal Services, Pacoima, California, for amicus curiae Valley Pride Village Tenants Association. Andrew Scherer, Legal Services for New York City, Legal Support Unit, New York City, for amici curiae Community Training and Resource Center, Inc., et al. Edward J. Elsner, Bet Tzedek Legal Services, North Hollywood, California, for amicus curiae Victoria Cohen.

Jeff H. Eckland, Faegre & Benson LLP, Minneapolis, Minnesota, for amici curiae Apache Apartments of Owatonna, et al. With him on the brief were R. Carl Moy and William L. Roberts.

Joel Martin Levy, Staff Attorney, and Anthony A. Trendacosta, General Counsel, Santa Monica, California, for amicus curiae Santa Monica Rent Control Board. James K. Hahn, City Attorney, Claudia McGee Henry, Senior Assistant City Attorney, and Sharon Siedorf Cardenas, Assistant City Attorney, Los Angeles, California for amicus curiae City of Los Angeles. Louise H. Renne, City Attorney, Teresa L. Stricker–Croley, Deputy City Attorney, and Leslie B. Trutner, Deputy City Attorney, San Francisco, California, for amicus curiae City and County of San Francisco.

Before MAYER, Chief Judge, ARCHER, Senior Circuit Judge, and SCHALL, Circuit Judge.

Opinion for the Court filed by Circuit Judge SCHALL. Dissenting opinion filed by Senior Circuit Judge ARCHER.

SCHALL, Circuit Judge.

The United States appeals from the judgment of the United States Court of Federal Claims in a case arising out of contracts for the construction, financing, and regulation of low-income housing. *Cienega Gardens v. United States*, No. 94–1 C (Fed. Cl. June 18, 1997). The court ruled, on summary judgment, that the enactment of the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, 101 Stat. 1877 (1987) (pertinent parts reprinted in 12 U.S.C. § 1715*l* note (1989) (Preservation of Low Income Housing)) (hereinafter "ELIHPA") and the enactment of the Low–Income Housing Preservation and Resident Homeownership Act of 1990, Pub.L. No. 101–625, 104 Stat. 4249 (1990) (codified at 12 U.S.C. § 4101 et seq.) (hereinafter "LIHPRHA") breached contracts between the plaintiffs, owners of

low-income housing, and the Department of Housing and Urban Development ("HUD"). *See Cienega Gardens v. United States,* 33 Fed. Cl. 196, 202, 210 (1995); *Cienega Gardens v. United States,* 37 Fed. Cl. 79, 80, 84 (1996). Following a trial on damages, the court awarded damages in the total amount of $3,061,107 to plaintiffs/cross-appellants, Sherman Park Apartments, Independence Park Apartments, Pico Plaza Apartments, and St. Andrews Gardens. *See Cienega Gardens v. United States,* 38 Fed. Cl. 64, 66 (1997).[1] Because we conclude that the requisite privity of contract did not exist between the Owners and HUD with respect to prepayment of the mortgage loans, so as to make HUD liable to the owners for breach of contract, we vacate and remand, with the instruction that the breach of contract claims be dismissed.

## BACKGROUND

### I.

In the 1950s and 1960s, in an attempt to encourage private developers to construct, own, and manage low and moderate-income housing, Congress enacted legislation that allowed the Federal Housing Administration, and later HUD,[2] to provide mortgage insurance. This insurance enabled private lending institutions to provide low-interest mortgages to project developers. *See Cienega Gardens,* 33 Fed. Cl. at 202. Under two programs instituted under the National Housing Act of 1934, along with the mortgage insurance, developers also received certain financial incentives. *See id.*

Prior to 1968, owners/developers received below-market mortgage interest rates through a program referred to as "Section 221(d)(3)," 12 U.S.C. § 1715*l*(d)(3). *See Cienega Gardens,* 33 Fed. Cl. at 202 (citing Pub.L. No. 83–560, 68 Stat. 590, 597 (1954), amended by, Pub.L. No. 87–70, 75 Stat. 149 (1961)). Owners obtaining mortgages after 1968 received market-rate mortgages with an interest subsidy through a program referred to as "Section 236," 12 U.S.C. § 1715z–1. *See Cienega Gardens,* 33 Fed. Cl. at 202 (citing Pub.L. No. 90–448, § 201(a), 82 Stat. 476, 498, 499 (1968)). Owners were expected to pass the benefits of the program in which they participated on to their tenants in the form of lower rents. *See id.* at 202–03.

Generally, when obtaining a HUD-insured mortgage under either of the above programs, an owner executed a deed of trust note payable to a private lending institution. *See id.* at 203. The note evidenced a loan made to the owner pursuant to a loan agreement between the owner and the lending institution that contemplated advances to the owner. Payment of the indebtedness evidenced by the note was secured by a deed of trust, or a mortgage, on the subject property. The note and deed of trust were printed on forms approved by HUD, and HUD endorsed the note as part of its mortgage insurance. *See id.* The repayment term of the loan was generally forty years. *See id.* Simultaneously, in exchange for HUD's endorsement for insurance (pursuant to a commitment for insurance), the owner entered into a "regulatory agreement" with HUD, under which the owner agreed, among other things, to certain "affordability restrictions," including restrictions on the income levels of tenants, restrictions on allowable rental rates, and restrictions on the rate of return the owner could receive from the housing

---

1. The Court of Federal Claims, on summary judgment, found the government liable for breach of contract with respect to all of the plaintiffs listed in the caption (referred to collectively as "Owners"). *See Cienega Gardens v. United States,* 33 Fed. Cl. 196, 210 (1995); *Cienega Gardens v. United States,* 37 Fed. Cl. 79, 84 (1996). For purposes of judicial economy and to conserve the parties' resources, however, the Owners and the government selected four "model plaintiffs" for purposes of litigating the damages issue. *See Cienega Gardens,* 38 Fed. Cl. at 67 n. 3. After the damages trial, the court entered judgment with respect to the four model plaintiffs, Sherman Park Apartments, Independence Park Apartments, Pico Plaza Apartments, and St. Andrews Gardens. *See Cienega Gardens v. United States,* No. 94–1 C (Fed. Cl. June 18, 1997). The court stayed all proceedings with respect to the remaining thirty-eight Owners listed as plaintiffs in the caption of this appeal. *See Cienega Gardens v. United States,* 94–1 C (Fed.Cl. May 15, 1997).

2. In 1965, the Federal Housing Administration was subsumed into the then newly-established Department of Housing and Urban Development. *See* 24 C.F.R. §§ 200.1, 200.2 (1994).

project. *See id.* The regulatory agreement and the mortgage insurance provided by HUD were to remain in effect so long as the loan remained outstanding. *See id.*

While the regulatory agreement made no mention of the right to prepay the outstanding loan, a rider to the deed of trust note permitted the owner to prepay the loan in full, without HUD approval, after twenty years. *See id.* Developers could not prepay their loans prior to twenty years, except under certain conditions, including HUD approval. *See id.* The prepayment rules in the riders reflected contemporaneous HUD regulations, *see* 24 C.F.R. §§ 221.524(a)(ii), 236.30(a)(i) (1970), governing the Section 221(d)(3) and Section 236 programs. *See Cienega Gardens,* 33 Fed. Cl. at 203. By prepaying the outstanding loan, an owner could terminate HUD's affordability restrictions on the property. The owner then could convert the property into a conventional rental property and charge market rental rates, thereby obtaining a greater return on the investment.

## II.

In the late 1980s, concerned that a large number of owners might shortly exercise their prepayment options, thereby reducing the supply of low-income rental housing, Congress enacted ELIHPA. *See id.* ELIHPA took effect on February 5, 1988. *See* 12 U.S.C. § 1715*l* note (1989) (Preservation of Low Income Housing, § 234). It placed a two-year moratorium on mortgage prepayments to allow Congress time to devise a permanent solution to the possible shortage of low-income housing, *see* 12 U.S.C. § 1715*l* note (1994) (Preservation of Low Income Housing, § 221(b)). *See Cienega Gardens,* 33 Fed. Cl. at 203–04. ELIHPA did not prohibit prepayments altogether, however. Rather, it required HUD approval prior to prepayment, even after twenty years. *See* 12 U.S.C. § 1715*l* note (1994) (Preservation of Low Income Housing, §§ 221(a), 222, 225); *Cienega Gardens,* 33 Fed. Cl. at 204.

In 1990, ELIHPA was replaced by LIHPRHA, which took effect on November 28, 1990. *See* 12 U.S.C. § 4101 note (1994) (Historical and Statutory Notes: Effective Dates). LIHPRHA made the moratorium on prepayment, contained in ELIHPA, permanent and authorized HUD to provide incentives to owners to encourage them to maintain the affordability restrictions on their properties and not prepay their mortgage loans. *See Cienega Gardens,* 33 Fed. Cl. at 204–05 (detailing the limited prepayment scheme left open under LIHPRHA). The key change caused by the enactment of ELIHPA and LIHPRHA was that owners could not prepay their mortgage loans after twenty years without HUD approval, as had been permitted under the riders to deed of trust notes and 24 C.F.R. §§ 221.524 and 236.30 (1970). This change made it more difficult for owners to convert their properties into conventional rental properties and thereafter charge market-rate rents.

In 1996, Congress enacted the Housing Opportunity Program Extension Act of 1996 ("HOPE"), Pub.L. No. 104–120, 110 Stat. 834 (March 28, 1996). HOPE allows owners to prepay their mortgages without prior HUD approval, so long as the owners agree not to raise rents for 60 days. *See Cienega Gardens,* 38 Fed. Cl. at 70; H.R.Rep. No. 104–34 at 4, 47 (1995) (effecting H.R.2099, 104th Cong. (1995)). HOPE is not before us in this case. The Owners' claims all arose as a result of ELIHPA and LIHPRHA.

## III.

Each of the Owners is a general or limited partnership that owns a low-income housing project in California and that participates in the Section 221(d)(3) or Section 236 program. *See Cienega Gardens,* 33 Fed. Cl. at 205. On January 3, 1994, a first set of Owners filed suit against the government in the Court of Federal Claims, seeking damages for breach of contract, just compensation under the Fifth Amendment for alleged takings of property, and additional compensation based on alleged unlawful administrative actions.[3]

---

3. The original Owners that filed suit were Cienega Gardens, Cedar Gardens, Claremont Village Commons, Covina West Apartments, Del Amo Gardens, Del Vista Village, DeSoto Gardens, Independence Park Apartments, Kittridge Gardens I, Kittridge Gardens II, Las Lomas Gardens,

*See id.* at 202. In their breach of contract claims, the Owners alleged that the enactment of ELIHPA and LIHPRHA breached contracts with HUD which they claimed allowed them to prepay their mortgage loans after twenty years without HUD approval. *See id.* at 205. On March 8, 1994, the government moved to dismiss for lack of jurisdiction; on the following day, the Owners moved for summary judgment.

In a March 27, 1995 opinion, the Court of Federal Claims denied the government's motion to dismiss and granted the Owners' motion for summary judgment on the breach of contract claims.[4] First, the court addressed the government's argument that it lacked jurisdiction over the breach claims because there was no privity of contract between HUD and the Owners. *See id.* The government argued that the Owners' claims were based on prepayment provisions contained in the deed of trust notes between the Owners and their lenders, not on provisions in the regulatory agreements between HUD and the Owners. *See id.* The government claimed that there was not privity of contract between HUD and the Owners because HUD was not a party to the deed of trust notes, which contained the prepayment provisions that allegedly had been breached. *See id.* The court determined that the fact that HUD was not a named party to the deed of trust notes, except as an endorser with respect to insurance, was not dispositive of the privity of contract issue. *See id.* at 210. The court held that all of the documents at issue had to be analyzed together in determining whether privity of contract existed:

> Thus, contrary to the defendant's assumptions, the "express contract" upon which plaintiffs base their claim is not to be found solely in either the deed of trust note or the regulatory agreement. The

two documents, which were signed contemporaneously, must be read together in order to determine the full intentions of the parties when they initially entered into their relationship.

*Id.* The court determined that "when the parties [i.e., HUD and the Owners] ... entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules set forth in the rider to the contemporaneous deed of trust note," and, therefore, privity of contract existed. *Id.*

The court then concluded that the Owners had established a breach of contract:

> By signing the regulatory agreement and the deed of trust note to which the regulatory agreement referred, plaintiffs promised to construct and maintain housing in accordance with the HUD's specifications, to accept only low or moderate-income persons as tenants, to charge no higher rents than those permitted by HUD, to distribute profits to shareholders in accordance with specified limitations, to make timely payments on their mortgages and to maintain cash reserves to self-insure against mortgage default. These promises were made expressly to and for the benefit of the government, not third parties. In exchange, the government agreed to endorse and insure the mortgages (allowing plaintiffs to obtain either subsidized commercial loans or loans at favorable interest rates) and to allow plaintiffs to free themselves of HUD's regulatory strictures after the first 20 years. Accordingly, the court finds that Congress, by enacting ELIHPA and LIHPRHA, breached the government's contracts with plaintiffs with respect to their prepayment rights.

*Id.* The court rejected the government's arguments that the sovereign acts doctrine,[5]

---

Oxford Park, Parthenia Townhomes, Pioneer Gardens, Puente Park Apartments, Rayen Park Apartments, Reseda Park Apartments, Roscoe Park Apartments, St. Andrews Gardens, San Jose Gardens, Sherman Park Apartments, and Sunland Park Apartments. *See Cienega Gardens,* 33 Fed. Cl. at 205 n. 8.

4. The Court of Federal Claims dismissed the claims for additional compensation for alleged unlawful administrative actions. *See Cienega Gardens,* 33 Fed. Cl. at 202, 223–24. In addi-

tion, the court denied both the Owners' and the government's motions with respect to the takings claims. *See id.* at 202, 213–23. Neither of these rulings is before us. The Owners' takings claims remain pending in the Court of Federal Claims.

5. For an explanation of the sovereign acts doctrine, *see Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 52–53, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990).

the doctrine of unmistakability,[6] and lack of contracting authority[7] prevented liability. *See id.* at 211–13. Given its decision that HUD had breached its contracts with the Owners and the lack of evidence concerning damages, the court stated that a damages trial would be necessary. *See id.* at 213.

On April 10, 1995, the government moved for reconsideration of the breach of contract issue. *See Cienega Gardens v. United States,* No. 94–1C, slip op. at 1 (Fed.Cl. Apr. 13, 1995). The government argued that the riders to the deed of trust notes could be interpreted as establishing prepayment terms between the private lending institution and the Owners rather than establishing prepayment terms between HUD and the Owners, as the court had determined. *See id.* The government argued that summary judgment was inappropriate given these two possible interpretations, which it asserted created an ambiguity. *See id.* The court rejected the argument and denied the motion for reconsideration. *See id.* at 2, 4.

In an April 1, 1996 order, the Court of Federal Claims joined twenty-one "new plaintiffs" to the suit. *See Cienega Gardens,* 37 Fed. Cl. at 80.[8] The new plaintiffs' complaint raised the same three claims that had been presented by the original plaintiffs. *See id.* The government moved for summary judgment on the breach of contract and alleged unlawful administrative action claims, while the new plaintiffs moved for summary judgment on the breach of contract claims. *See id.* Based on its previous decision, the court granted the new plaintiffs' motion for summary judgment on the breach of contract claims.[9] *See id.* at 80–81, 84.

On November 18–21, 1996, the Court of Federal Claims held a trial to quantify damages. *See Cienega Gardens,* 38 Fed. Cl. at 66. As noted in footnote 1 above, the parties selected four "model plaintiffs" for purposes of litigating the damages issue. *See id.* at 67 n. 3. The model plaintiffs were (1) Sherman Park Apartments, owned by the Sherman partnership, (2) Independence Park Apartments, owned by the Independence partnership, (3) St. Andrews Gardens, owned by the St. Andrews partnership, and (4) Pico Plaza Apartments, owned by the Pico partnership. *See id.* Each of these projects is located in Los Angeles. *See id.* at 69. The court held that the model plaintiffs were entitled to breach of contract damages in the total amount of $3,061,107. *See id.* at 66, 89. In so holding, the court ruled that the Los Angeles Rent Stabilization Ordinance ("LARSO"), Ordinance No. 152,120 (codified at Ch. XV, Los Angeles Municipal Code), was preempted by LIHPRHA because LARSO conflicted with the federal scheme enacted through LIHPRHA. *See Cienega Gardens,* 38 Fed. Cl. at 82–85. The court thus determined that LARSO, which limits rental rates on certain covered properties, did not bar or limit recovery for the government's breach of contract. *See id.* at 85.

On May 15, 1997, the court ordered entry of judgment based on its decisions and stayed all proceedings on the claims of the

---

**6.** For an explanation of the doctrine of unmistakability, *see United States v. Winstar Corp.,* 518 U.S. 839, 871–87, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

**7.** The government contended that even if HUD intended to promise the owners that they could prepay their mortgages regardless of future legislation restricting them from doing so, the promise was unenforceable for lack of express authority from Congress.

**8.** The "new plaintiffs" were Argonaut Apartments, Beck Park Apartments, Blossom Hill Apartments, Casa San Pablo, Central Park Apartments, Drehmoor Apartments, Fairview Green Apartments, Genessee Park Apartments, Grace & Laughter Apartments, Green Hotel, Hollywood Knickerbocker Apartments, Hollywood Plaza,

Kings Canyon Apartments, Lawrence Road Apartments, Livermore Gardens, Palo Alto Gardens, Pico Plaza Apartments, Placita Garden Apartments, Skyline View Gardens, Villa Fontana, and Village Green. The new plaintiffs had all entered into Section 221(d)(3) or Section 236 mortgages. *See Cienega Gardens v. United States,* 37 Fed. Cl. 79, 81 (1996).

**9.** The Court of Federal Claims dismissed the claim for additional compensation for alleged unlawful administrative actions. *See Cienega Gardens,* 37 Fed. Cl. at 80, 85. That ruling is not before us. Unlike the first set of Owners, the new plaintiffs did not move for summary judgment on their takings claims. *See id.* at 85. As is the case with the original plaintiffs, the new plaintiffs' takings claims remain pending in the Court of Federal Claims.

remaining plaintiffs pending appeal. *See Cienega Gardens v. United States,* No. 94–1 C (Fed.Cl. May 15, 1997). Judgment was entered accordingly on June 18, 1997. *See Cienega Gardens,* No. 94–1 C (Fed. Cl. June 18, 1997). The government appealed on August 20, 1997. On September 8, 1997, Sherman Park Apartments, Independence Park Apartments, Pico Plaza Apartments, and St. Andrews Gardens, the four model plaintiffs, cross-appealed, challenging the court's dismissal of their claim for damages based on alleged unlawful administrative actions.[10] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." RCFC 56(c). We review a grant of summary judgment by the Court of Federal Claims *de novo* to determine whether the summary judgment standard has been correctly applied. *See Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) (en banc), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir. 1998).

On appeal, the government raises three challenges to the decision of the Court of Federal Claims. First, it asserts that the court erred in holding that the enactment of ELIHPA and LIHPRHA breached contracts between HUD and the Owners[11] under which the Owners enjoyed an unrestricted right to prepay their HUD-insured mortgage loans twenty years after HUD's final endorsement of the loans for insurance. The

government argues that HUD was not a party to any agreement that granted the Owners an unrestricted prepayment right and that therefore it was not in privity with the Owners. It contends that the twenty-year unrestricted prepayment right appeared in the deed of trust notes, which HUD endorsed but to which it was not a party, and that neither the insurance commitments issued by HUD nor the regulatory agreements between HUD and the Owners contained or referenced any prepayment terms or conditions. The government argues that, because there was no privity of contract between HUD and the Owners, the court lacked jurisdiction with respect to the Owners' breach of contract claims. Second, the government challenges several aspects of the damages award. Third, it argues that the court erred in holding that LARSO was preempted by ELIHPA and LIHPRHA. Accordingly, the government urges, LARSO would have limited the rents that the Owners could have charged after prepayment, thereby reducing the amount of lost profits suffered as a result of any breach of contract. Because we resolve this appeal in favor of the government based on the jurisdiction issue, we do not address the government's second and third arguments.

### II.

■■■ Under the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1994). We have stated that "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government...." *Ransom v. United States,* 900 F.2d 242, 244 (Fed.Cir.1990). In other words, there must be privity of contract between the plaintiff and the United

---

**10.** In their brief to this court, the model plaintiffs abandoned their cross-appeal. However, because they failed to file a motion to voluntarily dismiss the cross-appeal, pursuant to Fed. Cir. R. 42(b), we must dispose of the cross-appeal. Therefore, the cross-appeal, No. 97–5134, is *DISMISSED with PREJUDICE,* and the mandate shall issue forthwith.

**11.** Throughout this opinion we use the term "Owners" to refer to all of the plaintiffs listed in the caption of this appeal. While the Court of Federal Claims only entered final judgment with respect to the four model plaintiffs and only those plaintiffs are before us, our analysis of the issue of liability applies to all of the plaintiffs, i.e., "Owners," not just the model plaintiffs.

States. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984) ("The government consents to be sued only by those with whom it has privity of contract."). The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity. *See National Leased Hous. Ass'n v. United States,* 105 F.3d 1423, 1436 (Fed.Cir.1997) (*National Leased Housing*). Whether a contract exists is a mixed question of law and fact. *See Ransom,* 900 F.2d at 244. Since the parties do not dispute the relevant facts, the privity issue reduces to a question of law, which we review *de novo.* Contract interpretation itself also is a question of law, which we review *de novo. See Winstar,* 64 F.3d at 1540; *Massachusetts Bay Transp. Auth. v. United States,* 129 F.3d 1226, 1231 (Fed.Cir. 1997).

### A.

We begin our analysis with the documents underlying the transactions at issue. In doing so, we focus on the documents relating to the four model plaintiffs, each of whom developed and operated a low-income rental housing project with a mortgage loan insured by HUD pursuant to Section 221(d)(3) or Section 236. *See Cienega Gardens,* 38 Fed. Cl. at 67.

■ The transactions at issue were accomplished as follows: First, pursuant to 24 C.F.R. § 221.509(a) or § 236.1 (1970), each of the Owners received a "Commitment for Insurance of Advances" from the Federal Housing Commissioner, acting on behalf of the Secretary of HUD. The commitment provided that the Commissioner would endorse for insurance a mortgage note in a specified amount. The specified amount represented the total amount of advances that were to be made to the Owner by a specified lending institution pursuant to a loan agreement between the Owner and the institution. Thus, the commitment stated: "Upon completion of the project in accordance with the Drawings and Specifications the mortgage note will be finally endorsed for insurance to the extent of the advances of mortgage proceeds approved by the Commissioner, subject to reduction as provided in the Regulations." The commitment further provided that "[t]he

insurance endorsement will be subject to compliance with the requirements of the Regulations, [i.e., the HUD regulations in effect at the time] and the terms and conditions set forth" in the commitment. The commitment required that the Owner enter into a regulatory agreement or other instrument "to permit the Commissioner's regulation of the Mortgagor as to rents, charges, and methods of operation." The regulatory agreement requirement was consistent with the pertinent regulations, which allowed the Commissioner to regulate the mortgagor for as long as HUD insured the mortgage loan. *See* 24 C.F.R. §§ 221.529, 236.1 (1970). The commitment also provided that "[a]ll certificates, documents and agreements called for by this commitment shall be on forms approved or prescribed by the Commissioner."

Pursuant to the commitment that it had received from HUD, at an initial closing, the Owner executed a "Deed of Trust Note." The deed of trust note established a mortgage loan between the Owner and a specified private lending institution. The deed of trust note was endorsed by HUD. The endorsement indicated that the Owner's mortgage loan had been approved for insurance by HUD. The note also incorporated an attached rider, referred to as "Rider A." Rider A to the Sherman Park Apartments note provided:

> This Rider is attached to and made a part of Deed of Trust Note dated November 2, 1970, by and between SHERMAN PARK APARTMENTS, a partnership, Maker[,] and UNITED CALIFORNIA BANK, Payee.

> The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited distribution mortgagor may prepay without such approval after twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Federal Housing Commissioner.

The riders to the notes of Pico Plaza Apartments, St. Andrews Gardens, and Inde-

pendence Park Apartments contained similar opening paragraphs and provided:

> The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except where: (1) the prepayment is in connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) the Maker is a limited distribution mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Commissioner or as a result of a sale of the project to a cooperative or nonprofit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act as amended.

Simultaneously with the execution of the deed of trust note, the Owner executed a "Deed of Trust." The deed of trust secured payment of the indebtedness evidenced by the deed of trust note by granting the relevant lending institution a mortgage on the project property. In the deed of trust, the Owner covenanted

> [t]hat the Regulatory Agreement, if any, executed by the Trustor and the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Deed of Trust. Upon default under the Regulatory Agreement and upon the request of the Federal Housing Commissioner, the Beneficiary [i.e., the private lending institution], at its option, may declare the whole of the indebtedness secured hereby to be due and payable.

The quoted language was contained in the Sherman Park Apartments deed of trust; the other deeds of trust contained substantially similar language.

Simultaneously with the execution of the deed of trust and the deed of trust note, the Owner and HUD entered into the regulatory agreement. The regulatory agreement stated in the preamble that the Owner was entering into the agreement "[i]n consideration of the endorsement for insurance by the Commissioner of the [deed of trust] note ... and in order to comply with the requirements of Section 221(d)(3) [or Section 236] of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto." In the regulatory agreement, the Owner agreed to comply with all "Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, creed, or national origin, including Title VI of the Civil Rights Act of 1964, [and] "all requirements imposed by or pursuant to the Regulations of the Department of Housing and Urban Development (24 CFR, Subtitle A, Part 1) issued pursuant to that title" for "so long as the contract of mortgage insurance continues in effect."

Although the regulatory agreement was signed on behalf of the Owner and HUD, it was the Owner who assumed obligations under the agreement. By signing the regulatory agreement, the Owner agreed to timely make all payments due under the deed of trust note and to set aside cash reserves to minimize the likelihood of default on the note. The regulatory agreement also contained numerous undertakings by the Owner with respect to management of the covered project. In addition, in the regulatory agreement, the Owner agreed to restrictions on the income levels of tenants, restrictions on allowable rental rates, and restrictions on the rate of return the Owner could receive from the project.

The question before us is whether the transaction framed by the commitment, the deed of trust note, the deed of trust, the loan agreement, and the regulatory agreement, each of which was in a form approved by HUD, gave rise to privity of contract between HUD and the Owner insofar as the right to prepay the mortgage loan was concerned. We conclude that it did not.

### B.

It has never been argued that HUD failed to provide mortgage insurance, as required

by each "Commitment for Insurance of Advances." In other words, it is undisputed that HUD discharged its obligations to the Owners under the various commitments. Thus, as the Court of Federal Claims recognized, *see Cienega Gardens,* 33 Fed. Cl. at 208–10, the question of whether the requirement of privity of contract was satisfied turns, in the case of each Owner, on consideration of the deed of trust note and the regulatory agreement. In approaching this question, we are mindful that, in order to find privity of contract, we must find on the part of HUD "the type of direct, unavoidable contractual liability that is necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract." *National Leased Housing,* 105 F.3d at 1426.

We start from the premise that the United States, i.e., HUD, was a named party to only one contract in connection with each of the relevant projects, that contract being the regulatory agreement. Moreover, in that regard, as just seen, it was the Owner, not HUD, that assumed obligations under the regulatory agreement. The regulatory agreement did not incorporate any other agreement, including the deed of trust note or Rider A to the deed of trust note. Neither did the regulatory agreement mention prepayment of the mortgage loan or incorporate any agreement or provision addressing prepayment.

It is true that *Thetford Properties IV Ltd. Partnership v. U.S. Dep't. of Hous. & Urban Dev.,* 907 F.2d 445 (4th Cir.1990), states that the regulatory agreements at issue in that case "expressly allowed the owners of [the] properties, without HUD's prior consent, to prepay their mortgages at the end of 20 years, thereby terminating HUD insurance and withdrawing the properties from the program." 907 F.2d at 446 (citing 24 C.F.R. § 221.524(a)(1989)) We attach little significance to this statement, however. *Thetford* involved a suit by owners of low-income housing projects with mortgage loans insured pursuant to section 221(d)(3). The owners sought a declaration that ELIHPA's restrictions upon prepayment of their mortgage loans violated their constitutional right to due process of law. *Id.* at 447. The district court dismissed the complaint after concluding that the owners had failed to exhaust their administrative remedies. *Id.* The court of appeals affirmed the dismissal without reaching the merits of the owner's claims. *Id.* at 450. The statement quoted above appears at the beginning of the opinion in a discussion of the statutory background. Because privity of contract was not at issue in *Thetford,* the quoted statement is properly viewed as *dictum.* Most importantly, however, the regulatory agreements before us contain no provisions relating to prepayment.

The only document that addressed prepayment was the deed of trust note, with its attached Rider A. However, the agreement represented by each deed of trust note was between the relevant Owner and its private lending institution, as evidenced by the recitals at the beginning of the note. Thus, each deed of trust note began with the statement "FOR VALUE RECEIVED, the undersigned promise(s) to pay to [name of lending institution] ... the principal sum of [the amount of the loan]...." Although HUD did provide its insurance endorsement, it was not expressly made a party to any deed of trust note or its attached Rider A.

Each deed of trust note was incorporated by reference into the applicable deed of trust. The deed of trust too represented a contract between the relevant Owner and its private lending institution, as evidenced by the recitals at the beginning of the deed of trust naming the relevant Owner and the lending institution. Each deed of trust also incorporated a rider, which was attached to it. The deed of trust and the rider incorporated the regulatory agreement by reference. However, the incorporation of the regulatory agreement—which set forth obligations on the part of the Owner—into the rider to the deed of trust did not make HUD a party to the deed of trust.

While recognizing the above, the Court of Federal Claims determined that all of the pertinent documents had to be construed together in order to determine the intent of the parties:

> Because the rider [to the deed of trust note] specifically allocated certain rights between HUD and plaintiffs, the fact that

HUD was not a named party (except as an endorser) to the deed of trust note containing the rider is not dispositive of the issue of privity of contract between the parties in this action. The government's participation as a party to the deed of trust note is unnecessary to establish privity of contract with respect to plaintiff's prepayment rights.

Thus, contrary to the defendant's assumptions, the "express contract" upon which plaintiffs base their claim is not to be found solely in either the deed of trust note or the regulatory agreement. The two documents, which were signed contemporaneously, must be read together in order to determine the full intentions of the parties when they initially entered into their relationship.

*Cienega Gardens,* 33 Fed. Cl. at 210 (footnote omitted). In support of this statement, the court relied on *Restatement (Second) of Contracts* § 202(2) (1981), which provides, "A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." The comment to this section states that this Rule in Aid of Interpretation does "not depend upon any determination that there is an ambiguity, but [is] used in determining what meanings are reasonably possible as well as in choosing among possible meanings." *Id.* at cmt. b. We agree with the Court of Federal Claims that all of the agreements before us are relevant in determining the meaning of each separate contract. However, we cannot sustain the court's conclusion that "when the parties in this case [i.e., the Owners and HUD] entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules set forth in the rider to the contemporaneous deed of trust note." *Cienega Gardens,* 33 Fed. Cl. at 210.

While the deed of trust note (and the incorporated Rider A) and the regulatory agreement were part of the same transaction, each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties. The Court of Federal Claims erred in importing requirements from the deed of trust note and the accompanying rider into

the regulatory agreement. The regulatory agreement, which was a document under which the Owner assumed obligations, did not address prepayment, and the court erroneously read the prepayment terms contained in the deed of trust note and Rider A, between the private lending institutions and the relevant Owner, into the regulatory agreement between HUD and the Owner. The critical point is that the contract documents simply do not show privity of contract between the Owners and HUD with respect to a right to prepay the mortgage loans after twenty years without HUD approval.

C.

At the time the various agreements were executed, the regulation governing prepayment under the Section 221(d)(3) program provided:

> (a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner in the following cases:
>
> . . . . .
>
> (ii) Where the mortgagor is a limited distribution type, which is not receiving payments from the Commissioner under a rent supplement contract executed pursuant to the provisions of §§ 5.1 et seq. of this title, and where the prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage.

24 C.F.R. § 221.524 (1970). The regulation governing prepayment under the Section 236 program provided:

> (a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where the mortgagor is a limited distribution type and either of the following conditions is met:
>
> (i) If the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage, provided the mortgagor is not receiv-

ing payments from the Commissioner under a rent supplement contract executed pursuant to the provisions of §§ 5.1 et seq. of this title.

24 C.F.R. § 236.30 (1970). While these regulations permitted prepayment after twenty years without HUD approval, the regulations were expressly subject to amendment:

The regulations in this subpart may be amended by the Commissioner at any time and from time to time, in whole or in part, but such amendments shall not adversely affect the interest of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.

24 C.F.R. §§ 221.749, 236.249 (1970).

The regulations governing the Section 221(d)(3) and Section 236 programs further support our conclusion that there was no privity of contract between HUD and the Owners with respect to prepayment of the deed of trust notes. The Court of Federal Claims concluded that "when the parties in this case entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules set forth in the rider to the contemporaneous deed of trust note." *Cienega Gardens*, 33 Fed. Cl. at 210. However, it would have been inconsistent for HUD to have entered into the regulatory agreement if the agreement fixed the prepayment rights of the Owners, in view of the express power to amend the Section 221(d)(3) and Section 236 program regulations at any time that was reserved to HUD, subject only to the caveat that *mortgagees'* interests not be adversely affected. *See* 24 C.F.R. §§ 221.749, 236.249 (1970).

### III.

### A.

The Owners cite to several portions of the legislative history of ELIHPA and LIHPRHA, which they argue support their claim for breach of contract and show that Congress understood that these statutory enactments would breach contracts between HUD

and the Owners. We need not address this argument in detail. It is sufficient to state that the statements in the legislative histories of ELIHPA and LIHPRHA cannot alter the content of the documents on which the Owners attempt to base their contractual claims. The after-the-fact views of various parties cannot create a contractual relationship between HUD and the Owners with respect to prepayment terms, where the contractual documents themselves fail to evidence such a relationship.

### B.

 The Owners also argue that HUD's intimate involvement with the projects at issue created privity of contract with respect to the prepayment terms in the riders attached to the deed of trust notes:

The government's contention that the prepayment provision was a matter of contract solely between the Owner and the lender/mortgagee also ignores HUD's intimate involvement with all aspects of the agreement. HUD conceived the structure of the transaction, prescribed and approved all of the relevant documents (including the Note and its rider), and furnished most of the specific language.

(Appellees' brief at 19–20.) HUD's involvement in the various transactions underlying this case, however, did not, as a matter or law, give rise to privity of contract with respect to the right to prepay the mortgage loans.

In *Dana Construction, Inc. v. United States*, 229 Ct.Cl. 862 (1982), the court stated that "it is settled that there is no privity of contract between the U.S. and a public housing contractor based on the U.S. Housing Act." *Id.* at 863. The court also stated: "That the Federal Government has intimate control over a project, including prior approval of plans and costs, does not establish liability here for claims by a contractor." *Id.* In *Dana Construction*, the court held that a construction contractor who had contracted with an agency that received federal funding to build a low-income housing project did not have privity of contract with, and could not assert a claim for breach of contract against,

HUD. *See id.* In *Housing Corporation of America v. United States*, 199 Ct.Cl. 705, 468 F.2d 922 (Ct.Cl.1972), the court addressed a contract claim by a contractor that had entered into an agreement with a state authority, subsidized by HUD. *See id.* at 924. While HUD and the state authority contracted that HUD would lend money to the state authority, *see id.* at 923, and the contract between the state authority and the contractor was on a HUD-approved form, *see id.*, the court ruled that there was no privity of contract between the contractor and HUD because HUD was not a party to any contract with the contractor, *see id.* at 924, 926. In *National Leased Housing, supra*, the owners of rental properties entered into Housing Assistance Program contracts, some directly with HUD and some via HUD-approved contracts with public housing agencies. 105 F.3d at 1425. The court held that owners who entered into the two-tier contract scheme, i.e., contracted with public housing agencies rather than directly with HUD, lacked privity of contract with HUD, while owners who contracted directly with HUD had privity of contract. *See id.* at 1437. In so ruling, the court noted that HUD's obligations under the two-tier contract scheme were directed toward the public housing agencies rather than the owners. The court determined that, under the two-tier scheme, HUD had no direct contractual relationship with the owners and that therefore there was no privity of contract with the owners. *See id.* at 1436–37.

In *Dana Construction* and *Housing Corporation of America*, the government was not a party to any agreement with the contractor who was seeking recovery from the United States. The same was true with respect to the project owners who entered into the two-tier contract scheme in *National Leased Housing*. That is different from this case, where HUD entered into the various regulatory agreements. These cases do make it clear, however, that in order for the government to be liable for breach of contract, there must be privity of contract and that the degree of HUD involvement with a project does not create privity so as to allow suit against the government. The Owners' contention that HUD's involvement with the

transactions at issue resulted in privity of contract thus fails.

The Owners did have contractual relationships with HUD via the various regulatory agreements. As seen above, however, the contract evidenced by each of the regulatory agreements was limited in scope to obligations on the part of the Owner that were in consideration for HUD having endorsed the deed of trust note which evidenced the loan to the Owner from its lending institution. Although there was a contract – the regulatory agreement – between each of the Owners and HUD, the Owners' claims are based on the prepayment terms in the deed of trust notes and the attached riders. HUD and the Owners had no contractual relationship with respect to prepayment rights, and HUD's involvement in the contracts between private lending institutions and the Owners could not create such a contractual relationship.

### C.

Finally, the Owners contend that this case is controlled by, or analogous to, *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir.1995) (en banc), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *Winstar*, this court held that the government had breached its express contracts with various financial institutions through the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIR-REA"), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in relevant part at 12 U.S.C. § 1464). *See Winstar*, 64 F.3d at 1534. Each of the financial institutions had contracted with the government for approval to purchase failing thrifts. At the same time, each institution also had contracted for approval, in the process, (i) to use supervisory goodwill toward its minimum regulatory capital requirements and (ii) to amortize the goodwill over periods of up to forty years. *See id.* at 1536. We held that each financial institution had entered into an express agreement with the government and that, by virtue of an integration clause, each contract incorporated contemporaneous documents that expressly permitted the accounting

treatment at issue.[12] *See id.* at 1540–44. We then determined that the enactment of FIR-REA breached these express agreements. *See id.* at 1544. The plaintiffs in *Winstar* had contracts with integration clauses that expressly incorporated contemporaneous documents that allowed them to use supervisory goodwill and the stated amortization periods. The Owners in the present case can point to no similar contractual provisions. The regulatory agreements do not address prepayment and do not contain integration clauses that incorporate any document addressing prepayment. In fact, no documents between HUD and the Owners address prepayment. The deed of trust notes and the attached Riders A were not incorporated into the regulatory agreements by reference, nor was HUD a party to the deed of trust notes and incorporated riders. The regulatory agreements, which set forth obligations on the part of the Owners, merely referenced HUD's role as endorser for insurance of the mortgage loans. *Winstar* provides no support for the Owners' claims.

## IV.

We hold that there was no privity of contract between HUD and the Owners with respect to prepayment of the deed of trust notes. Pursuant to each "Commitment for Insurance of Advances," HUD contracted to provide mortgage insurance, but did not agree to any prepayment terms. Neither were there any prepayment terms in the regulatory agreements between HUD and the Owners. The only contractual prepayment terms were contained in the deed of trust notes and the attached riders, to which HUD was not a party. Because there was no privity of contract between HUD and the Owners with respect to prepayment of the deed of trust notes, HUD could not be liable to the Owners for breach of contract by reason of the enactment of ELIHPA and LIHPRHA. Thus, the Court of Federal Claims erred in granting summary judgment in favor of the Owners on their breach of contract claims. The court should have granted summary judgment in favor of the government on the breach of contract claims.

## CONCLUSION

For the foregoing reasons, we vacate the judgment in favor of the four model plaintiffs. The case is remanded to the Court of Federal Claims, which is directed (i) to enter judgment in favor of the government on the Owners' breach of contract claims, (ii) to dismiss the breach of contract claims, and (iii) to conduct such further proceedings, consistent with this opinion, as may be necessary.

## COSTS

Each party shall bear its own costs.

## *VACATED* and *REMANDED* with *INSTRUCTIONS*

ARCHER, Senior Judge, dissenting.

The decision of the Court of Federal Claims holding that the government breached its contracts with the plaintiffs (Owners) should, in my view, be affirmed. The Court of Federal Claims (CFC) correctly held that the Owners were promised the right, and therefore entitled, to prepay their mortgages on these low and moderate-income housing projects without HUD approval after twenty years, as set forth in Rider A to the Deed of Trust Notes. This contract right was breached when Congress enacted statutes, commonly referred to as ELIHPA and LIH-PRHA, that prevented them from prepaying their mortgages without HUD's approval.

The majority holds there was no privity of contract between HUD and the Owners. Even though Rider A to the Notes expressly provided that the Owners could elect to prepay the mortgage after twenty years without HUD approval, the majority reasons that this does not bind the government because

---

12. For example, one of the contracts contained an integration clause that, in relevant part, provided:

> This Agreement, together with an interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties thereto and su-

persedes all prior agreements and understandings of the parties in connection herewith, *excepting only the Agreement and Merger and any resolutions or letters issued contemporaneously herewith by the [Bank Board] or the FSLIC ....*

*Winstar,* 64 F.3d at 1540 (emphasis added).

the Notes were contracts between the lenders and Owners and were only endorsed for insurance by HUD. The majority also holds that the Owners cannot rely on the provisions of the HUD regulations in effect at the time these transactions took place, which also permitted prepayment without HUD approval after twenty years, because the regulations were amendable. I think the majority has reached the wrong conclusion in each instance.

In analyzing each of the pertinent agreements separately, the majority has not considered critical factors which support the CFC's conclusion that the government intended and in fact did bind itself to the prepayment provisions. Principally, these factors are the overall purpose and nature of the transactions, the intent of the parties, the terms and conditions of HUD's Commitments for Insurance of Advances, and the references in the HUD's Commitments and endorsements of the Notes to specific, dated HUD regulations governing these transactions.

### A.

The purpose of the HUD low and moderate-income housing programs fully supports the CFC's decision. At the time these transactions occurred, Congress and HUD were encouraging private parties to construct low and moderate-income housing with subsidized or low interest rate loans guaranteed by the government. *See, e.g.* H. Rep. No. 90–1585 at 2, 21 (1968). In turn, the Owners were severely restricted as to the rents they could charge and the income they could earn from these projects. *See* 24 C.F.R. § 207.253(a)(2)(1970). These disincentives were offset, however, by the fact that after twenty years the Owners would be permitted to repay the mortgages without prior approval of HUD and at the same time be relieved from the government's rent and profit restrictions. Thus, after the twenty year period, the Owners would be able to charge market rates for the housing units. It is undisputed that the Owners, lenders and HUD all entered into these transactions with the full knowledge and intent that the Owners would repay the mortgages after the

twenty year period if it was economically advantageous to them. *See Cienega Gardens v. United States,* 38 Fed. Cl. 64, 75 (1997).

The nature and mechanics of the transactions required by the HUD programs support the CFC's decision as well. Projects under these programs were commenced by applying to HUD for the issuance of a Commitment for Insurance of Advances to the Owners and the lenders. In accordance with the regulations, both the Owners and the lenders had to make application for the Commitment. The regulations specifically provided:

> An application for issuance of either a conditional or firm commitment for insurance of a mortgage on a project shall be submitted by an approved mortgagee and *by the sponsors* of such project.

*See* 24 C.F.R. § 221.502(a), § 236.5(a)(1970) (emphasis added).

The Commitments issued by HUD to the Owners, as well as the lenders, was in the nature of an offer to provide mortgage insurance when the specific requirements set forth in the Commitments were completed. HUD was then contractually obligated to place its insurance endorsement on the Notes.

The Owners were required to provide a number of documents and agreements, all of which were prescribed and/or approved by HUD as to form and content. Among these were the documents relating to the mortgage loan, including the Deed of Trust (FHA Form 4104–G) and the Deed of Trust Note (FHA Form 4104–e). In this connection, HUD furnished additional language to the Notes in the form of Rider A. Rider A specifically provided that the Owners could prepay the Notes after twenty years without HUD's consent. The Rider also contained restrictions on prepayment by the Owners in the absence of HUD approval, during the first twenty years of the mortgage.

### B.

The CFC carefully examined the nature and purpose of the low and moderate-income housing statutes and regulations, the specific documents executed to carry out the transactions and other evidence of record. Based on

all of the documents and evidence, the court determined that "when the parties ... entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules set forth in the rider to the contemporaneous deed of trust note." *Cienega Gardens v. United States,* 33 Fed. Cl. 196, 210 (1995). The court noted the various promises made by the Owners to HUD and the government's concurrent promises to the Owners, as follows:

> By signing the regulatory agreement and the deed of trust note to which the regulatory agreement referred, plaintiffs promised to construct and maintain housing in accordance with the HUD's specifications, to accept only low or moderate-income persons as tenants, to charge no higher rents that those permitted by HUD, to distribute profits to shareholders in accordance with specified limitations, to make timely payments on their mortgages and to maintain cash reserves to self-insure against mortgage default. These promises were made expressly to and for the benefit of the government, not third parties. In exchange, the government agreed to endorse and insure the mortgages (allowing plaintiffs to obtain either subsidized commercial loans or loans at favorable interest rates) and to allow plaintiffs to free themselves of HUD's regulatory strictures after the first 20 years. Accordingly, the court finds that Congress, by enacting ELIHPA and LIHPRHA, breached the government's contracts with plaintiffs with respect to their prepayment rights.

*Id.* at 210.

In reaching the conclusion that contracts between HUD and the Owners had been breached by the enactment of ELIHPA and LIHPRHA, the Court of Federal Claims considered whether Rider A to the Notes created contractual rights between HUD and the Owners and whether there was privity of contract as to these provisions. The court expressly found that the provisions of Rider A were intended to create contractual rights between these parties, even thought the named parties to the Notes were the Owners and the lenders. It reasoned that there was privity of contract between the Owners and

HUD as to the prepayment provisions because mutual rights and obligations were set forth in the Rider. The court stated:

> As discussed earlier, the rider gave HUD the right to approve or disapprove prepayment prior to the first twenty years following HUD's endorsement, and the rider allowed prepayment without HUD approval after the first twenty years. *Despite the fact that HUD was not a named party the deed or trust note—the fact upon which defendant's privity argument rests—the rider gave the lender no right whatsoever to interfere with an owner's plan to prepay. The rider gave that power only to HUD, and only permitted such interference during the first 20 years of the mortgage. Because the rider specifically allocated certain rights between HUD and plaintiffs, the fact that HUD was not a named party (except as an endorser) to the deed of trust note containing the rider is not dispositive of the issue of privity of* contract between the parties in this action. The government's participation as a party to the deed of trust note is unnecessary to establish privity of contract with respect to plaintiff's prepayment rights.

*Id.* at 209–210 (emphasis added).

The CFC concluded that the parties, including HUD, intended to be bound by the prepayment provision set forth in Rider A. The court's effort to find the parties' intent based on all of the documents and the surrounding facts and circumstances was entirely appropriate in complex integrated transactions of this sort, where multiple parties executed multiple documents at closing. Here, there were two such closing sessions, the first when HUD gave its initial endorsement permitting the projects to be constructed and the second when HUD gave its final endorsement after the projects were completed.

The fallacy in the majority's analysis is that it has considered each of the documents necessary to fulfill the term of the Commitments in virtual isolation. By narrowly interpreting each agreement in this standalone fashion, I think the majority has come to the wrong result as to the Owners' privity with HUD and as to HUD's intention and

contractual obligation at the time these agreements were executed.

Accordingly, I would accept the Court of Federal Claim's factual findings that the relevant parties, HUD and the Owners, intended to bind themselves to the prepayment provisions as set forth in Rider A.

### C.

I am also convinced that the Commitments and subsequent endorsements by HUD of the Notes in these transactions establish as a matter of law the requisite privity between the Owners and HUD to find an enforceable express contract as to the prepayment right. As noted above, HUD's Commitment was issued to the Owners as well as to the lenders. It provided that if the enumerated conditions were met and the required documents in the form prescribed or approved by HUD were furnished and executed to HUD's satisfaction, HUD would be obligated to insure and endorse the Notes. One of the HUD approved provisions was Rider A. In Rider A, HUD obtained control in a contractual document over any proposed prepayment by the Owners during the first twenty years of the mortgage, and because this control was set forth in the Notes themselves the lenders were put on notice of HUD's controlling position. Similarly, the Owners' prepayment rights after twenty years were made known to the lenders.

When HUD endorsed the Notes with these provisions, HUD was fulfilling its Commitment obligations and thereby giving approval to all of the underlying documents and executed agreements that were conditions to its endorsements. Because HUD sought to obtain, and did obtain in the Notes that it approved, the right from the Owners for this control over any proposed prepayment until after the 20th year, it effectively became a party by its endorsements of the Notes as to the prepayment provisions. In my view, the privity of contract as to the dominant Commitment contracts carried over to the underlying documents HUD required for its endorsements and insurance of the Notes insofar as those documents contained provisions benefiting HUD or in

which HUD approved rights beneficial to the Owners.

### D.

Finally, the judgment of the Court of Federal Claims should, in all events, be affirmed because the Owners were entitled to prepayment rights after twenty years under the provisions of the HUD regulations in effect at the time HUD issued its Commitments and endorsed the Notes. The majority has rejected this position on the ground that the regulations contained a section permitting the regulations to be amended. Because these transactions were consummated under the provisions of regulations in effect as of specific dates, I believe the majority has erred.

In the HUD Commitments accepted by the Owners, which as noted were the dominant contracts, HUD expressly stated that the insurance endorsements would be made under the pertinent provisions of the National Housing Act and "the Regulations thereunder *now in effect.*" (Emphasis added.) When HUD endorsed the Notes the endorsements contained written or typed in dates, corresponding to the Commitment dates, showing that the endorsements were made under the regulations "in effect" on the Commitment dates. These provisions indicate that HUD did not intend that any subsequent amendment to the regulations would be applicable to the particular Commitment contracts and Note endorsements. It is undisputed that the regulations referred to in these documents expressly permitted Owners to prepay their mortgage notes after twenty years without HUD's consent and thereby be relieved of restrictions on rentals and profits.

Contrary the majority's holding, the fact that HUD reserved the right in 24 C.F.R. §§ 221.749, 236.249 (1970) to amend its regulations respecting prepayment generally does not permit it to do so when the Commitments as well as the Note endorsements provide that the regulations in effect on a specific date were to be applicable. The judgment of the Court of Federal Claim is also sustainable on the grounds that the prepayment provisions of the regulations in effect on the

date of HUD's Commitments were controlling and binding on the government.