MOORE, Circuit Judge.
The United States appeals from the decision of the Court of Federal Claims that the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) (ELIHPA), and the Low-Income Housing Preservation and Resident Homeownership Act, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (LIHPRHA) resulted in a temporary regulatory taking. CCA Associates (CCA) cross-appeals, asserting that ELIHPA and LIHPRHA resulted in a breach of the government’s contractual obligations. Because we are bound to apply the economic analysis outlined in Cienega X, we conclude that the Court of Federal Claims determination on the temporary taking must be reversed. Because the Court of Federal Claims correctly held that our Cienega TV precedent forecloses CCA’s breach of contract claim, we affirm the judgment against CCA on the breach of contract claim.
Background
The history of the statutes involved in ELIHPA and LIHPRHA takings cases was summarized by this court on several occasions. See, e.g., Cienega Gardens v. United States, 503 F.3d 1266 (Fed.Cir.2007) (Cienega X); Cienega Gardens v. United States, 331 F.3d 1319 (Fed.Cir.2003) (Cienega VIII); Cienega Gardens v. United States, 194 F.3d 1231 (Fed.Cir.1998) (Cienega IV). A brief recap of the legislative background leading up to ELIHPA and LIHPRHA is necessary to understand the issues in this case. In 1961, Congress amended the National Housing Act to allow private developers to meet the needs of moderate income families. Cienega X, 503 F.3d at 1270. Among other things, the amendment provided financial incentives to private developers to build low income housing. Id. These incentives included below-market mortgages, which permitted the owners to borrow 90% of the cost of the project. Id. While the term of the mortgage was 40 years, the contracts allowed the developer to prepay the mortgage after 20 years. Id. Congress also protected the lenders against default by authorizing the Federal Housing Administration to insure the mortgages. Id. at 1270-71. The tax laws at the time provided a number of tax incentives, which allowed general and limited partners to take large deductions in the earlier years of the investment. Id. at 1271. The highly leveraged nature of the investment made the tax benefits large in comparison to the small up-front investment.- Id.
These development programs were regulated by the Department of Housing and Urban Development (HUD), and the developers were required to sign a regulatory agreement binding them to get approval from HUD for certain relevant decisions, for example increases in rent. Id. The developer also signed a secured note and a mortgage. HUD, in turn, provided mortgage insurance for the investment. Id. The restrictions in the regulatory agreement were in effect as long as HUD insured the mortgage on the property; for practical purposes this meant the developers were subject to HUD regulation until the mortgage was paid off. Id. The twenty year prepayment option in the mortgage therefore gave the developers an opportunity to cast off the regulatory burden and convert their development to market rate housing.
While this plan induced developers to provide low income housing, Congress ulti *1243 mately grew worried that participants would prepay their mortgages and exit the program en mass. Id. at 1272. In order to avoid the resulting shortage of low income housing, Congress enacted ELIHPA and LIHPRHA. Id. The exact restrictions placed on the developers are detailed in, e.g., Ciénega X, but the salient issue in this case is that an owner was no longer free to prepay the mortgage after twenty years. Instead, the owner either needed HUD approval to prepay the mortgage (which was not a viable option, id. at 1272 n. 2), or go through a series of regulatory hoops that would delay prepayment and therefore extend the time the landowner was subject to HUD regulation, id. at 1272-73. Among other restrictions, while under HUD regulation the landowner could not charge market rates for renting the property. Eventually, Congress restored prepayment rights to the program participants. Id. at 1274.
In order to enter the program, the developer signed three documents: the regulatory agreement, the secured note, and the mortgage. In this case, each of these three documents were contemporaneously signed by Ernest B. Norman and J. Robert Norman in a conference room at HUD’s New Orleans office in 1969. CCA Assocs. v. United States, 91 Fed.Cl. 580, 585-86 (2010).[1] Each document was drafted by HUD, and these agreements were written on either HUD or Federal Housing Authority forms. Id. at 586. The secured note, which was endorsed by HUD, included a term allowing prepayment after 20 years, and also incorporated the mortgage by reference. Id. The mortgage, in turn, incorporated the secured note and regulatory agreement by reference, and was signed by the Norman brothers and the Pringle-Associated Mortgage Corporation (but not by HUD). Id. Finally, the regulatory agreement was signed by HUD and the Norman brothers. In the regulatory agreement, the Norman brothers agreed to charge HUD-approved rents to HUD-approved tenants as long as the contract for mortgage insurance continued in effect. The regulatory agreement incorporated by reference legislation and regulations related to the program. Id. In sum, HUD was a signatory to only the regulatory agreement, which did not expressly include the 20 year prepayment provision. The Norman brothers later transferred their interest to CCA. Id. at 586-87.
Under the terms of the documents signed by the Norman brothers, the 20 year prohibition on prepayment expired in May 1991. Id. at 602. As a result of LIHPRHA, however, CCA was not allowed to prepay the mortgage and was forced to continue to operate the development (Chateau Cleary) as low income housing. In 1996, Congress lifted its prior restriction on prepayment with the HOPE Act. The total time that CCA was prohibits ed from prepayment was five years and ten days. Id.
This case involves two issues related to the restriction on prepayment effectuated by ELIHPA and LIHPRHA (the “preservation statutes”). First, does the restriction on prepayment, which resulted in limitations on the property owner’s use of its land due to the required continued participation in the HUD program, constitute a temporary regulatory taking? The Court of Federal Claims held that the statutory restriction of prepayment rights constituted a taking. The United States appeals this portion of the decision. Second, did *1244 Congress breach the contract between HUD and CCA by abrogating the prepayment right, thereby mandating the property continue to be subject to use and rent restrictions? The Court of Federal Claims held that the statutory restriction of prepayment rights did not constitute a breach of contract. CCA cross-appeals this portion of the decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).
Analysis
The issues presented in this case are not unique to CCA. The ELIHPA and LIHPRHA statutes spurred a number of claims from parties similarly situated to CCA. Much of our jurisprudence in the area stems from the Cienega Gardens line of cases, which sets out a framework that we are bound as a panel to apply to the case at hand. Indeed, CCA’s claims in this case were previously remanded for consideration and application of our decision in Cienega X, 503 F.3d 1266. CCA, 91 Fed.Cl. at 584.
Many of CCA’s arguments in this case are directed at issues resolved by Cienega X and Cienega IV. Even if we are sympathetic to the arguments challenging the propriety of the economic analysis required by Cienega X and the breach of contract law of Cienega IV, we cannot consider these arguments at the panel stage. Panels are bound by the law of prior panels. See Hometown Financial, Inc. v. United States, 409 F.3d 1360, 1365 (Fed.Cir.2005) (“[W]e are bound to follow our own precedent as set forth by prior panels.”).

I. CCA’s TAKINGS CLAIM

Typically, when considering whether government action constitutes a regulatory taking, we apply factors set forth in Penn Central: (1) “[t]he economic impact of the regulation on the claimant”; (2) “the extent to which the regulation has interfered with distinct investment-backed expectations”; and (3) “the character of the governmental action.” Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). We will consider each of these factors in light of the legal rules of Ciene-ga X, by which we are bound.
A. Economic Impact
The first factor in a takings analysis is the “economic impact on the claimant.” Penn Cent., 438 U.S. at 124, 98 S.Ct. 2646. The economic impact of the five year delay in prepayment has admittedly been a bit of a moving target. Applying an analytical approach previously affirmed by this court in Cienega VIII, the trial court initially found an 81.25% diminution in return on equity as a result of the five years that the preservation statutes prohibited prepayment. CCA, 91 Fed.Cl. at 611. This return on equity approach compared the return on equity under the preservation statutes with the return on equity CCA would have received but for the preservation statutes. Id. In Cienega X, however, we held that any economic impact must be evaluated with respect to the value of the property as a whole, and not limited to the discrete time period that the taking was in force. Cienega X, 503 F.3d at 1280. After noting that “[i]n temporary takings cases, the courts ordinarily have looked to rental value or other equivalent measures of non-permanent use,” id., the Court of Federal Claims applied our revised Cienega X approach to the calculation of economic impact. Though CCA disagreed with the approach required by Cienega X the parties stipulated that in light of Cienega X, “‘CCA suffered an economic impact of 18 percent as a result of ELIHPA and LIHPRHA,’ ” not accounting for any offsetting benefits. CCA, *1245 91 Fed.Cl. at 612 (quoting the Joint Stipulation of Facts).
In Ciénega X, however, we held that any economic impact to the plaintiffs must be weighed against any offsetting benefits that they received from the preservation statutes. Id. at 1282-88. We identified a number of possible benefits and reasoned that these benefits might serve to offset any economic harm. Id. at 1284-87. When these benefits are established, they “must be considered as part of the takings analysis.” Id. at 1283-84.
The Court of Federal Claims correctly explained that its offsetting benefits analysis “must consider facts as they existed in New Orleans at the time, not merely what the regulations indicate was possible.” Id. at 618. It then analyzed different benefits, concluding, inter alia, that “a fair-market sale under LIHPRHA before September 1996 is too speculative to offset the economic loss imposed on CCA by the prepayment restrictions.” Id. As part of this analysis, the court concluded that “the burden is on the government to show that other statutory benefits should offset” the economic impact. Id. at 613-14.
We see no error in this analysis and apportionment of the respective burdens. Although the plaintiff has the burden to prove a taking occurred, this ultimate burden does not require the plaintiff to identify and come forward with evidence rebutting economic harm. The plaintiff must establish economic impact, but it need not establish the absence of any mitigating factors. Offsetting benefits, if there are any, must be established by the government to rebut the plaintiffs economic impact case. Cf. Rose Acre Farms, Inc. v. United States, 559 F.3d 1260, 1275 (Fed. Cir.2009) (refusing to apply offsetting benefits when the “government points to no economic data in the record to support its assertion of offsetting benefits”). Once CCA came forward with evidence of an economic impact, the government then had the burden to establish any offsetting benefits which would mitigate or reduce the impact.[2] Contrary to the government’s argument, and the dissent’s claims, nothing in Ciénega X requires the plaintiff to bear the burden of establishing the value of offsetting benefits. What Ciénega X held is that, in assessing whether a takings has occurred, “available offsetting benefits must be taken into account generally, along with the particular benefits that actually were offered to the plaintiffs.” 503 F.3d at 1287. This is precisely what was done here. The Court of Federal Claims conducted a thorough analysis of the offsetting benefits evidence proffered by the government, and concluded the potential benefits were too speculative to mitigate CCA’s proof of economic harm. We see no error in this analysis and no clear error in the extensive fact findings of the trial court on the offsetting benefits.
Since the government failed to establish any offsetting benefits, the econom *1246 ic impact, given the requirements of Ciene-ga X, is stipulated to be 18%. Although CCA lost over $700,000 of net income (81.25% during the five years), using the economic impact methodology of Cienega X, the economic impact of 18% is not substantial enough to favor a takings in this specific case. While there is no per se rule, the economic impact must be more than a mere diminution. Cienega VIII, 331 F.3d at 1343. For example, we have previously held that a loss of 77% of the value in the property is a compensable taking. Id. Like the government, we are “aware of no case in which a court has found a taking where diminution in value was less than 50 percent.” Appellant Br. 19 (citing cases, all of which have at least a 50 percent diminution in value). In light of the facts of this case, we cannot conclude that an 18% economic impact qualifies as sufficiently substantial to favor a taking. Because we are bound by the economic impact methodology of Cienega X we must conclude that the Court of Federal Claims erred when it held that this factor supported a taking.
Ultimately, the difference between the Cienega X and Cienega VIII methodology is the difference between an 18% and 81% economic impact, a substantially different result stemming solely from our change in the economic analysis between the two cases. While the plaintiff stipulated to the 18% economic impact, CCA continued to dispute the propriety of the Cienega X methodology. Cienega X makes it virtually impossible for any ELIHPA or LIH-PRHA plaintiff to establish the severe economic impact necessary for a takings. Rather than consider the impact the regulation had on the property during the time it was in effect, such as the amount of money the plaintiffs actually lost in rents during that time period, Cienega X requires that the impact be measured against the total value over the remaining life of the property. See id. at 1281-82 (stating the test for a regulatory taking must “ ‘compare the value that has been taken from the property with the value that remains in the property’” (quoting Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 644, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993))).[3]
In the case of ELIHPA or LIHPRHA plaintiffs the mortgage notes lasted 40 years with 20 year prepayment options. ELIHPA and LIHPRHA prevented prepayment for at most 8 years. Hence, HUD participants had to maintain the property as low income housing for at most 8 years longer than they should have under the mortgage contracts. This means the denominator for the takings analysis in these cases is the total net income over the entire remaining useful life of the property (the net income over *1247 the rest of the mortgage — generally 20 years). If the net income over the entire remaining life of the mortgage is the denominator there is no way that even a nearly complete deprivation (say 99%) for 8 years would amount to severe economic deprivation when compared to our prior regulatory takings jurisprudence. If this methodology were to apply beyond ELIH-PA and LIHPRHA cases, for example to temporary regulatory restrictions on fee simples, then all income earned over the entire remaining useful life of the real property would be the denominator. This would virtually eliminate all regulatory takings. Quite frankly, the selection of the denominator in these cases is going to determine the severity of the economic impact. In Cienega X, we deviated from the traditional lost rent or return on equity approach, and instead required that the lost income be compared to all of the money the property would earn over its remaining life. We are bound by Cienega X but note that its application is limited to the ELIHPA and LIHPRHA cases.
While the parties may be correct that this economic impact analysis required by Cienega X virtually forecloses the finding of a takings in these cases, that there is conflict between Cienega VIII and Cienega X, and that this analysis was not required by Tahoe-Sierra, it is clearly required by Cienega X, and we are bound to follow that case. Therefore, we conclude that the Court of Federal Claims erred when it held that the 18% economic impact weighed in favor of a taking.
B. Investment-Backed Expectations
In Cienega X, we explained that in LIHPRHA and ELIHPA takings cases, the analysis of whether the landowner had a reasonable investment-backed expectation in the pre-payment of the mortgage requires a multistep analysis. Cienega X, 503 F.3d at 1289. By comparing the individual’s expectations with the “expectations of the industry as a whole,” we aimed to separate unreasonable, though subjectively believed, investment backed expectations from objectively reasonable expectations. Id. at 1290. The government argues that CCA’s expectations of prepayment are unreasonable since many developers participated in the program primarily for the tax benefits.
Cienega X, however, does not suggest that there can only be one objectively reasonable investment strategy for the industry, and we hold that there can potentially be multiple objectively reasonable investment strategies dictated by geography, economics, or other factors. While the government’s evidence in this case suggests that one class of investors was motivated primarily by the tax benefits, this does not end the inquiry: the plaintiff can offer proof that other investment strategies are also objectively reasonable. CCA has the burden to present sufficient evidence of these other strategies to establish that it was objectively reasonable for it to view the 20 year prepayment clause as the primary or “but for” reason for investment. Id.
We believe CCA failed to carry its burden. The Court of Federal Claims explained that “factors associated with the location and character of projects strongly influenced the reasonable expectation of the owners, judged on an objective and not a subjective basis.” CCA, 91 Fed.Cl. at 609. While this may be true, the only objective evidence of the industry’s investment backed expectations is a quote from a 1972 guide which indicated that a project located “in a growing suburban or exurban area, it may increase in value over the years, thus creating substantial residual profits to the investors upon sale or other disposition.” Id. (quotations, citations *1248 omitted, emphasis added). This hypothetical statement, however, does not support the ultimate conclusion that it was objectively reasonable to view the 20 year prepayment as either the principle or but for cause of investment. In fact, the same guide indicates that one of the principal benefits of the investment is the tax shelter. Id.
The Court of Federal Claims also cited evidence that some developers (three out of the six considered) retained residual proceeds from a sale or other disposition of a project. Id. at 608. Again, however, the prospectuses for these developers “described the potential benefits for investing in the projects as being primarily tax benefits and secondarily cash distributions.” Id. (emphasis added). While the trial court conducted a thoughtful analysis of the disparate treatment of tax benefits, the fact that “the general partners in three of the six instances were willing to sell short-term tax benefits and dividends but wanted to retain a significant portion of the long-term benefits from property appreciation” is not enough to demonstrate it was objectively reasonable to view the 20 year prepayment clause as the but for or primary reason for investment. The fact that the prospectuses[4] in question “do not assign any weight to the ability to prepay after 20 years as a reason to invest, with most dismissing the possible net proceeds from prepayment after 20 years at a nominal value of one dollar,” id. at 608, further undercuts the evidence that CCA’s subjectively believed investment strategy was objectively reasonable. Because the evidence in this ease fails to demonstrate that CCA’s investment backed expectations were objectively reasonable in light of industry practice as a whole, as required by Ciénega X, the Court of Federal Claims erred by holding this factor weighed in favor of a taking.
C. Character of the Governmental Action
Ciénega X did not disturb our prior precedent relating to the character of the government action. As a result, when we remanded this case to the Court of Federal Claims, it was reasonable for the trial court to reinstate its prior character analysis. CCA, 91 Fed.Cl. at 601-02. Indeed, Cienega VIII explained that “as a matter of law, that the government’s actions in enacting ELIHPA and LIHPRHA, insofar as they abrogated the [plaintiffs’] ... contractual rights to prepay their mortgages and thereby exit the housing programs, had a character that supports a holding of a compensable taking.” Cienega VIII, 331 F.3d at 1340. As such, the Court of Federal Claims correctly held that “the character of the government action is not such as to deliver the dispositive blow that CCA has hoped, [but] it nonetheless weighs in favor of a finding of a regulatory taking.” CCA, 91 Fed.Cl. at 602.
D. Summary
While the character of the government’s action supports finding a taking, it is not dispositive of this issue. Because we are bound by the analysis of Cienega X, and the other factors weigh against a taking, we conclude that CCA failed to establish that the denial of the prepayment right constituted a regulatory taking.

II. CCA’S CONTRACT CLAIM

CCA cross-appeals the holding that there is no privity of contract between *1249 HUD and CCA.[5] The Court of Federal Claims held CCA’s contract claim in this case is foreclosed by Cienega Gardens v. United States, 194 F.3d 1231 (Fed.Cir.1998) ((Cienega IV). CCA, 91 Fed.Cl. at 598. Although CCA attempts to distinguish Cienega IV on the facts, we agree with the trial court that these distinctions are unavailing. Simply holding that Cienega IV controls this issue, however, ignores the exceedingly thoughtful and thorough analysis of this issue carried out by the Court of Federal Claims in its opinion.
There are three relevant documents in this case: the regulatory agreement, the secured note, and the mortgage. CCA argued that these three documents constitute one overall transaction. CCA, 91 Fed.Cl. at 592. The three documents are preprinted, standard HUD forms, and were signed contemporaneously in a single room in HUD’s New Orleans office. Id. HUD only signed one of the three documents, the regulatory agreement, id. at 591, which did not mention the right to prepay the mortgage or incorporate the secured note (which did include the right to prepay), id. at 592. The regulatory agreement does, however, reference HUD’s regulations, which specified the prepayment right. Id. HUD also endorsed the secured note, which explicitly articulated CCA’s right to prepay the mortgage. Id. at 591.
Ultimately, all three documents are intended to reach a single goal: to induce developers to provide low income housing. Each of these three documents forms a critical part of the overall transaction, and without any one of these documents, the overall terms binding CCA would be substantially different. Id. at 592. Faced with these interrelated documents, the trial court asked: “Does the failure of the regulatory agreement to expressly incorporate the other two instruments negate the general contractual principle that interrelated instruments should be considered together?” Id. at 594-95. While our opinion in Cienega IV answers this question in the negative, the Court of Federal Claims pointed out that reading the three documents together “gives effect to the fact that the 20-year limit on prepayment contained in the secured note was a provision drafted by HUD that replicated HUD’s regulations on prepayment and was used by HUD to induce participation in the program.” Id. at 595. The Court of Federal Claims ultimately concluded that “[c]onsidering that the documents at issue constitute an integrated transaction, and in light of the other circumstances surrounding the transaction, this court, but for the precedent in Cienega IV, would hold that HUD and CCA were in privity as to the 20-year prepayment provision.” Id. at 598.
The trial court is not alone in its criticism of Cienega IV. In Aspenwood Investment Co. v. Martinez, 355 F.3d 1256 (10th Cir.2004), the Tenth Circuit confronted an analogous issue in the context of a declaratory judgment action. While it noted that Cienega IV was the case “most directly on point,” it nevertheless found “the analysis of the dissent [in Cienega IV] ... more persuasive than that of the majority.” Id. at 1260. The Tenth Circuit reasoned “that by executing the regulatory agreement, the note, and related documents,” the landowner promised to operate the housing project to effectuate the purpose of the HUD regulations, and noted that the landowner’s “promises were primarily for the benefit of HUD (and the participants in *1250 the low income housing program), not for the lender.” Id. In light of these circumstances, the Tenth Circuit concluded that the three documents constituted “a single, overarching agreement,” and held that “it was the demonstrated intent of HUD (and of plaintiff and of the lender) to be bound by the terms of all of the parts of the transaction.” Id.
Cienega IV turned on our conclusion that “there was not privity of contract between HUD and the [landowners] with respect to prepayment of the deed of trust notes.” 194 F.3d at 1246. In reaching this conclusion, we started “from the premise that the United States, i.e., HUD, was a named party to only one contract,” the regulatory agreement. Id. at 1241-42. We acknowledged the Restatement (Second,) of Contracts § 202(2) (1981) rule that “‘all writings that are part of the same transaction are interpreted together.’ ” Id. at 1243 (quoting the Restatement). We also acknowledged that this rule “does ‘not depend upon any determination that there is an ambiguity, but [is] used in determining what meanings are reasonably possible as well as in choosing among possible meanings.’ ” Id. (quoting the Restatement ). We even conceded that “the deed of trust note ... and the regulatory agreement were part of the same transaction.” Id. Thus, as highlighted by the dissent in Cienega IV, the Tenth Circuit in Aspen-wood, and the Court of Federal Claims in this case, it is certainly possible that the three agreements should be interpreted together. We nevertheless found that “each document stands alone and is unambiguous on its face,” and that the “documents evidence separate agreements between distinct parties.” Id.
The facts in this case do not distinguish it from Cienega IV, which we must apply to the case at hand. We therefore hold that the Court of Federal Claims correctly determined that Cienega IV forecloses CCA’s contract claims in this ease. To the extent CCA believes either Cienega IV or Cienega X was wrongly decided, en banc review is its only course of action.
AFFIRMED-IN-PART and REVERSED-IN-PART
Costs
No costs.

. HUD later approved an increase in the amount of the mortgage, and the Norman brothers signed a second secured note and second mortgage — once again on HUD forms — in 1971. CCA, 91 Fed.Cl. at 586 n. 7.

. The trial court correctly held that the government must prove (1) the existence of offsetting benefits and (2) the value of those benefits. A non-speculative valuation of any potential benefits is necessary to accurately establish whether they offset the economic impact on the landowner. The Court of Federal Claims found that the government failed to prove by a preponderance of the evidence that the proffered offsetting benefits in this case had any non-speculative value. See, e.g., CCA, 91 Fed.Cl. at 614 (discussing whether sale was "probable”); id. at 617 (while "possible" that a buyer could be identified, that "possibility is uncertain” and a sale therefore too speculative to offset harm); id. at 618 (possibility of sale "too speculative to offset the economic loss” of prepayment restriction). Preponderance of the evidence is the correct standard, and we see no error in this analysis.

. Cienega X bases this "life of the property” requirement on the Supreme Court decision in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Cienega VIII actually addressed the relevance of Tahoe Sierra expressly holding that the impact to the property as a whole was employed in Tahoe Sierra in order to determine whether the regulatory taking should be treated as a Lucas style per se taking. 331 F.3d at 1344-45. The Cienega VIII court explained that this “whole property” concept was not employed in the context of analyzing the economic impact under the Penn Central regulatory taking factors. Id. In fact, the relatively short timespan of the 32 month moratorium in Tahoe-Sierra, as compared to the entire life of the property, did not cause the Supreme Court to dismiss the possibility that "if petitioners had challenged the application of the moratoria to their individual parcels, instead of making a facial challenge, some of them might have prevailed under a Penn Central analysis." 535 U.S. at 334, 122 S.Ct. 1465.

. Ciénega X indicates that contemporaneous documents, such as prospectuses, may help prove the existence of objectively reasonable investment strategies. 503 F.3d at 1290-91. Ciénega X, however, does not require the use of prospectuses, and other kinds of evidence may be equally enlightening.

. The government argues CCA waived its contract claim. We disagree: the Court of Federal Claims properly allowed CCA to proceed on this issue in light of our previous remand. See CCA, 91 Fed.Cl. at 591 n. 14.