# United States Court of Appeals for the Federal Circuit

ANAHEIM GARDENS, L.P., THETFORD PROPERTIES III, L.P., THETFORD PROPERTIES IV, L.P., B-L ASSOCIATES, L.P., C-W ASSOCIATES, L.P., GLENVIEW GARDENS L.P., INDIAN HEAD MANOR, L.P. I, METRO WEST LIMITED, L.P., MILLWOOD ASSOCIATES L.P., NAPA PARK APARTMENTS L.P., ONTARIO TOWNHOUSES, L.P., PALOMAR APARTMENTS, L.P., SIERRA VISTA ONE, L.P., 825 SAN TOMAS APARTMENTS, L.P., 5324 FOOTHILL APARTMENTS, G.P., ALGONQUIN HEIGHTS ASSOCIATES, L.P., BRANDY HILL COMPANY, BROOKSIDE MANOR ASSOCIATES, L.P., BRIAR CREST, G.P., BRIAR CREST APARTMENTS II, L.P., BRIAR HILLS, L.P., CLARENCE W. GOSNELL, JR., JOHN G. GOSNELL, MURRAY HABER, RICHARD S. BRIGHT, PHILIP BERMAN, ALFRED S. BRIGHT, SAMUEL EISENSTAT, MELVIN S. HELLER, MILTON S. LIDER, MARTIN MYERS, MALCOMB MEISTER, HAROLD D. PRICE, HERBERT W. SAVIT, WALTER WEITZNER, ESTATE OF JACK N. BLINKOFF, HAROLD D. FRAZEE, TRUSTEE U/A DTD 4/2/89 FOR E.D. FRAZEE, CAMBRIDGE SQUARE NORTH ASSOCIATES, LP, CAMBRIDGE SQUARE OF FORT WAYNE ASSOCIATES I, LP, CAMBRIDGE SQUARE OF GRAND RAPIDS ASSOCIATES I, LP, CAMBRIDGE SQUARE OF GRAND RAPIDS ASSOCIATES II, LP, CARRIAGE HOUSE NORTH ASSOCIATES LP, CARRIAGE HOUSE OF MISHAWAKA ASSOCIATES II LP, CARRIAGE HOUSE WEST IV ASSOCIATES, LP, CROMWELL COURT COMPANY, FIRST LANDMARK

**ASSOCIATES, L.P., FOREST GLEN LIMITED DIVIDEND HOUSING ASSOCIATION, FORT HEATH ASSOCIATES, GARRISON FOREST ASSOCIATES, JODANI ASSOCIATES, L.P., KIMBERLY ASSOCIATES L.P., KING'S GRANT COMPANY, LEADER HOUSE ASSOCIATES, LEADER HOUSING CO., INC., NEW AMSTERDAM ASSOCIATES, NEW AMSTERDAM HOUSES, INC., PINE CREST COMPANY, RIVERSIDE VILLAGE COMPANY, SUBURBIA ASSOCIATES, L.P., STEPHEN G. DAKES, HARVEY E. JOHNSON, JR., W. DEWEY RASNAKE, MARTIN E. BROWN, WARREN W. TAYLOR, JR., WARREN W. TAYLOR, JR., TRUSTEE, LUDLOW KING, JAMES L. BREHONY, SUEHAR ASSOCIATES LP, TOWER WEST ASSOCIATES LP, TOWER WEST INC., TOWN & COUNTRY APARTMENTS & TOWNHOUSES,**
*Plaintiffs*

**CEDAR GARDENS ASSOCIATES, ROCK CREEK TERRACE L.P., 620 SU CASA POR CORTEZ, BUCKMAN GARDENS, L.P., 3740 SILVERLAKE VILLAGE, L.P., CHAUNCY HOUSE COMPANY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

————————————

2019-1277, 2019-1278, 2019-1279, 2019-1280, 2019-1281, 2019-1282

————————————

Appeals from the United States Court of Federal Claims in Nos. 1:93-cv-00655-PEC, 1:93-cv-06568-PEC, 1:93-cv-06578-PEC, 1:93-cv-06580-PEC, 1:93-cv-06582-

PEC, 1:97-cv-05837-PEC, 1:97-cv-05845-PEC, Judge Patricia E. Campbell-Smith.

———————————

Decided:  March 25, 2020

———————————

HARRY JAMES KELLY, III, Nixon Peabody LLP, Washington, DC, argued for plaintiffs-appellants.  Also represented by JOHN C. HAYES, JR., BRIAN J. WHITTAKER.

SHARI A. ROSE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by JOSEPH H. HUNT, ANNA BONDURANT ELEY, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

———————————

Before LOURIE, CHEN, and STOLL, *Circuit Judges.*

LOURIE, *Circuit Judge.*

These cases involve takings claims resulting from the enactment of the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) ("ELIHPA") and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990) ("LIHPRHA") (collectively, the "Preservation Statutes").  Currently, approximately fifty plaintiffs are asserting takings claims in consolidated cases in the United States Court of Federal Claims ("Claims Court").  The appellants here are Buckman Gardens L.P. ("Buckman"), Chauncy House Company ("Chauncy"), Cedar Gardens Associates ("Cedar"), Rock Creek Terrace L.P. ("Rock Creek"), 620 Su Casa Por Cortez ("Su Casa"), and 3740 Silverlake Village, L.P. ("Silverlake").  The six appellants have been designated the First Wave Plaintiffs ("FWPs") in the Claims Court litigation.

The Claims Court granted summary judgment in favor of the government on all six FWPs' takings claims. *Anaheim Gardens v. United States*, 140 Fed. Cl. 72 (2018) ("*Decision*"). For the reasons below, we affirm the Claims Court's judgment with respect to Su Casa but we vacate and remand with respect to the other five FWPs.

BACKGROUND

I

The history of the statutes involved in ELIHPA and LIHPRHA takings cases has previously been summarized by this court. *See, e.g.*, *CCA Assocs. v. United States*, 667 F.3d 1239, 1242–43 (Fed. Cir. 2011); *Cienega Gardens v. United States*, 503 F.3d 1266, 1270–74 (Fed. Cir. 2007) ("*Cienega X*"). For completeness, we provide the following brief summary of the relevant portions.

In 1961, Congress amended the National Housing Act to provide financial incentives to private developers to build low-income housing. *Cienega X*, 503 F.3d at 1270. The financial incentives included below-market mortgages insured by the Department of Housing and Urban Development ("HUD"). *Id.* To participate in this development program, each developer was required to sign a regulatory agreement with HUD that limited its ability to increase rent. *Id.* The restrictions in the regulatory agreement would be in effect as long as HUD insured the mortgage; for practical purposes, this meant a developer was subject to HUD regulation until its mortgage was paid off. *Id.* Importantly, while the term of the mortgages was 40 years, the contracts allowed developers to prepay their mortgages after 20 years. *Id.* This prepayment option gave each developer "an opportunity to cast off the regulatory burden and convert [its] development to market rate housing." *CCA*, 667 F.3d at 1242.

Many developers were induced by the development program to purchase properties and develop low-income

housing. *Id.* But Congress later grew concerned that too many developers would exercise the prepayment option and exit the program, which would cause a shortage of low-income housing. *Id.* at 1242–43. To address that concern, between 1988 and 1990, Congress enacted the Preservation Statutes, which effectively eliminated the prepayment option and prevented the developers from converting their properties to market rate housing. *Id.*; *see* 12 U.S.C. § 4101. In 1996, however, Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 (1996) ("HOPE Act"), which restored prepayment rights to the developers that had remained in the program.

II

The six FWPs are developers who owned properties that were developed subject to the development program under the 1961 amendments to the National Housing Act. The six FWPs can be broken down into three categories based on the timing of their purchases and their later decisions with respect to the Preservation Statutes prior to the enactment of the HOPE Act.

The first category consists of four FWPs—Buckman, Chauncy, Cedar, and Silverlake—that fit two criteria: (1) they owned their properties before the enactment of the Preservation Statutes; and (2) they sold their properties after the enactment of the Preservation Statutes in conformance with the sale requirements of LIHPRHA. *See* 12 U.S.C. §§ 4102, 4103, 4110. The LIHPRHA sale requirements included a requirement that the owners sell the property at the "highest and best use of the property" to organizations that would agree to preserve the rent restrictions. *See Cienega X*, 503 F.3d at 1272 (quoting §§ 4103(b)(2), 4110). The statute and regulations established a procedure to determine the sale price based on a third-party appraisal of the property's value. *Cienega X*, 503 F.3d at 1273 n.3; 24 C.F.R. §§ 248.111(j), 248.131(b).

The second category consists of Rock Creek, which owned its property prior to the enactment of the Preservation Statutes but chose not to sell its property after the enactment of the Preservation Statutes.  Instead, Rock Creek elected to remain in the low-income housing program by entering into a "use agreement" with HUD.  *Decision*, 140 Fed. Cl. at 80–81.  The use agreement provided Rock Creek with financial incentives in exchange for Rock Creek's agreement to abide by the low-income housing restrictions "for the remaining useful life" of the property.  *Id.*; *Cienega X*, 503 F.3d at 1273 (quoting 12 U.S.C. § 4112) (footnote omitted).

The third category consists of Su Casa, which is different from the other five FWPs in one important respect: Su Casa *did not own* its property prior to the enactment of the Preservation Statutes.  Rather, Su Casa purchased its property from the original owner in July 1991, which was after the enactment of LIHPRHA but before HUD promulgated its regulations for implementing the Preservation Statutes.  Su Casa subsequently sold its property pursuant to the LIHPRHA sale requirements.

III

Each of the FWPs filed suit in the Claims Court alleging a regulatory taking under the Fifth Amendment's "just compensation" clause.  After the close of discovery, the government moved for summary judgment.  The Claims Court evaluated the government's motion under the three-factor test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  The *Penn Central* test considers: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with reasonable distinct investment-backed expectations; and (3) the character of the governmental action.  *Id.* at 124.

The Claims Court first considered Su Casa's evidence of investment-backed expectations.  Su Casa presented a

declaration and deposition testimony from one of its general partners regarding its expectations based on its contract rights that it would be able to prepay the mortgage at or after the prepayment date. *See* J.A. 386–96, 3298–301. The Claims Court determined, however, that because the Preservation Statutes eliminated the prepayment option prior to Su Casa's purchase of the property, Su Casa "could not possess reasonable investment-backed expectations in a mortgage prepayment right." *Decision*, 140 Fed. Cl. at 77. The court then granted summary judgment against Su Casa because the complete lack of evidence of reasonable investment-backed expectations was sufficient to dispose of Su Casa's takings claim. *Id.* at 79.

For the remaining FWPs, the court considered their evidence with respect to each of the three factors in the *Penn Central* test. The court concluded that both the character of the governmental action and the investment-backed expectations weighed against disposing of the FWPs' takings claims on summary judgment. *Id.* at 87, 88. Regarding the economic impact factor, however, the court found that the FWPs "have not pointed to evidence sufficient to prevail on the economic impact prong of the *Penn Central* analysis." *Id.* at 89. Thus, the court granted summary judgment in favor of the government.

The Claims Court entered separate final judgments in favor of the government with respect to each of the FWPs' individual cases. The FWPs timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review *de novo* the Claims Court's summary judgment decision that the FWPs did not suffer a taking. *Biafora v. United States*, 773 F.3d 1326, 1330 (Fed. Cir. 2014) (citing *McGuire v. United States*, 707 F.3d 1351, 1357 (Fed. Cir. 2013)). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law.  R. Ct. Fed. Cl. 56(a).

I

We begin, as the Claims Court did, with Su Casa.  Su Casa argues that the court erred as a matter of law by finding, as a *per se* rule, that Su Casa lacked reasonable investment-backed expectations because it purchased its property after the enactment of the Preservation Statutes.  Su Casa further argues that there are genuine issues of material fact regarding Su Casa's understanding of its contract rights in view of the alleged uncertainty about how the Preservation Statutes would later apply at the prepayment date.

The government responds that the Claims Court did not create a *per se* rule, but rather determined that Su Casa could not meet its difficult burden to establish reasonable investment-backed expectations.  The government argues that the Claims Court properly relied on the undisputed fact that Su Casa was a sophisticated investor that bought its property knowing that the Preservation Statutes had already eliminated the prepayment option.

We agree with the government.  The governmental action in this case is the enactment of the Preservation Statutes.  Su Casa purchased its property in an arms-length transaction after it already knew that the Preservation Statutes had eliminated the prepayment option that previously existed under the 1961 amendments to the National Housing Act.  While the HUD regulations had not yet gone into effect at the time of the transaction, the Preservation Statutes themselves were sufficiently detailed to remove any reasonable expectation that Su Casa could have had that it would have the option to prepay its mortgage and convert its property from low-income housing to a market-rate rental property.  *See* 12 U.S.C. § 4101 *et seq.*

Su Casa's reliance on *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), is inapposite. In *Palazzolo*, the Supreme Court held that "[a] blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." *Id*. at 628. But the Court acknowledged in *Palazzolo* that it had "no occasion to consider the precise circumstances when a legislative enactment can be deemed a background principle of state law or whether those circumstances are present here." *Id*. at 629. Thus, because the petitioner's *Penn Central* claim was not barred *per se*, the Supreme Court remanded for the state court to consider whether the claimant—to whom title had transferred by operation of law rather than by purchase— could prove that he had reasonable investment-backed expectations regarding his development rights. *Id*. Here, unlike in *Palazzolo*, the Claims Court *did* have occasion to consider whether Su Casa could prove reasonable investment-backed expectations in view of the timing of its purchase and its knowledge about the Preservation Statutes. The Claims Court determined, not as a *per se* rule but rather as an evidentiary failure, that Su Casa lacked sufficient evidence to prevail at trial.

The Supreme Court's decision in *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017), is more instructive. There, the Court confirmed that "[a] reasonable restriction that predates a landowner's acquisition . . . can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property." *Id*. at 1945 (citing *Palazzolo*, 533 U.S. at 627). The Court held that the prior passage of the relevant state law "inform[ed] the reasonable expectation" that the property owners had with respect to their property. *Id*. at 1948. Likewise, here, the prior passage of the Preservation Statutes informs the question whether Su Casa could have expected when it invested in its property that it would later be able to prepay the mortgage.

What emerges from the case law is a flexible principle that, while "[a] valid takings claim will not evaporate just because a purchaser took title after the law was enacted," *Murr*, 137 S. Ct. at 1945 (citing *Palazzolo*, 533 U.S. at 627), the timing of the purchase and knowledge of the purchaser are relevant considerations in determining whether a purchaser had reasonable investment-backed expectations with which the government's regulatory action interfered. *See Norman v. United States*, 429 F.3d 1081, 1092–93 (Fed. Cir. 2005) (holding that "it is particularly difficult to establish a reasonable investment-backed expectation" if the property was acquired after the alleged regulatory restriction); *Loveladies Harbor v. United States*, 28 F.3d 1171, 1177,(Fed. Cir. 1994), (collecting cases) (noting that the investment-backed expectations factor of the *Penn Central* test is "a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime"), *abrogated on other grounds by Bass Enterprises Prod. Co. v. United States*, 381 F.3d 1360, 1369–70 (Fed. Cir. 2004). The Claims Court in this case abided by that principle when it considered the evidentiary support for Su Casa's claim despite the undisputed material fact that Su Casa was a sophisticated investor that purchased its property with knowledge about the effects of the Preservation Statutes. J.A. 3298–301 (testimony of one of Su Casa's general partners). We agree with the Claims Court that there is no genuine dispute regarding Su Casa's inability to prove that it purchased the property with an expectation that it would later be able to prepay the mortgage.

In the context of the *Penn Central* balancing test, the complete absence of reasonable distinct investment-backed expectations can weigh sufficiently heavily to be dispositive of a takings claim. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984); *Good v. United States*, 189 F.3d 1355, 1363 (Fed. Cir. 1999); *Golden Pac. Bancorp v. United*

*States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994). Here, because a sophisticated investor voluntarily purchased its property with knowledge that it had no prepayment option, the complete lack of investment-backed expectations overwhelmingly outweighs the other *Penn Central* factors. We therefore agree that summary judgment in favor of the government on Su Casa's takings claim is appropriate.

## II

We next turn to the Claims Court's determination that the remaining FWPs have not provided evidence sufficient to prevail on the economic impact factor in the *Penn Central* analysis. The Claims Court noted that the FWPs' only evidence of economic injury was founded on the methodology of their expert witness, Dr. William W. Wade. *Decision*, 140 Fed. Cl. at 89. The court granted summary judgment after finding Dr. Wade's entire analysis to be nonprobative of the Preservations Statutes' economic impact on the FWPs.

Dr. Wade's expert report contains more than 200 pages of opinions regarding the severe economic impact of the Preservation Statutes on the FWPs. In the executive summary of his report, Dr. Wade gave a general explanation of his analysis, and specifically why it focused on the lost rental income that the FWPs suffered due to the Preservation Statutes:

> From an economic point of view, denial of the owners' opportunity to increase their rents to market levels is the issue in this litigation. The restrictions imposed upon the use of the properties limited the owners' intangible property right: renting apartments on their properties at market rents. Where income losses are the issue, standard economic practice begins with measuring the cash flows *with* and *without* the loss-causing disruption within a discounted cash flow model (DCF). Just compensation and the *Penn Central* economic

prongs are evaluated by the change in income from the rental businesses . . . .

The reported  financial cash flows of the property owners are discounted to the present value amounts at the prepayment dates.  Losses are determined as the difference in the [net present value or] NPV of the projected lost opportunity to prepay and convert the properties to market rentals less the actual outcome imposed by LIHPRHA.  In other words, losses are calculated as the difference between what the owners received as a result of their LIHPRHA process and what they would have earned, if they had been allowed to prepay. Whether the losses frustrate *Penn Central's* [distinct investment-backed expectations] is evaluated by comparison of the Net Present Value (NPV) of cash flows for each property benchmarked to [transfer preservation equity or] TPE.

J.A. 3810–11.  Consistent with that explanation, Dr. Wade provided the following equation to determine the economic loss suffered by the FWPs as a result of the Preservation Statutes:

The NPV calculations compute economic losses as:

Economic Loss = [(PV (market conversion) less TPE) minus (PV (actual outcome) less TPE)]    [1]

Or,

Economic Loss = [ (NPV market conversion) minus (NPV actual outcome)]   [1']

Where:

$PV^6$ = Sum of discounted annual cash flows at prepayment date.

NPV = [PV (cash flows) less TPE] at prepayment date.

TPE = Transfer Preservation Equity, or owners' equity in the property at prepayment date, as defined by HUD pursuant to LIHPRHA.

J.A. 3811.  To calculate the percentage reduction in net present value, Dr. Wade divided the calculated economic loss by the net present value of the lost market conversion opportunity.  *See* J.A. 3812–22.

Despite Dr. Wade's opinions, the Claims Court found that Dr. Wade's analysis was nonprobative of economic impact under *Penn Central*. First, the court found that Dr. Wade's lost income analysis was nonprobative because he was required to analyze and compare fair market values. *Decision*, 140 Fed. Cl. at 89 ("[FWPs] have not established the fair market value (FMV) of the FWPs' properties at the time of the taking, for either the scenario where the mortgage prepayment right was unrestricted, or the scenario where the mortgage prepayment right was restricted by LIHPRHA."). And second, the court found that "Dr. Wade's methodology is unsound because it is inconsistent with binding precedent," in particular relating to "the parcel as a whole concept" and "economic loss severity measures." *Id*. at 89–91. We address the Claims Court's findings in turn, as well as the government's proposed alternative ground for affirmance based on Dr. Wade's use of data that post-dated the alleged taking.

A

The Claims Court concluded, as a matter of law, that a comparison of fair market values was the *only* permissible methodology for measuring economic impact in this case. From the start of its analysis, the Claims Court strictly adhered to the following asserted proposition of law:

> When a real estate parcel has been permanently affected by a regulatory taking, the measure of economic injury is the difference between the fair market value of the property, without the restriction imposed by the government action, and the fair market value of the property, with the restriction imposed by the government action, both measured at the time of the taking.

*Decision*, 140 Fed. Cl. at 80 (citing *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999); *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994))The Claims Court repeatedly confirmed its

reliance on that proposition.  *See, e.g., id.* at 82 ("First, the court determines the difference in the fair market value of the property, without and with the restriction, both measured at the time of the taking." (citing *Colony Cove Props. LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018)); *id.* at 83 ("[I]ts evidence of economic injury must allow the court to first determine the difference in fair market value caused by the Preservation Statutes . . . ."); *id.* at 86 ("To determine the economic injury, if any, suffered by these plaintiffs, the first step is to determine the difference in fair market value caused by the Preservation Statutes.").

For that proposition of law, the Claims Court cited this court's decision in *Forest Properties*, 177 F.3d at 1367, which in turn cited our earlier decisions in *Loveladies*, 28 F.3d at 1178, and *Florida Rock*, 18 F.3d at 1567.  In each of those cases, this court did in fact determine that the appropriate measure of economic impact, under the factual circumstances, was the "change . . . in the fair market value caused by the regulatory imposition."  *See Fla. Rock*, 18 F.3d at 1567.  We do not, however, interpret those cases to mean that change in fair market value is the *only* permissible way to measure economic impact in every case.  Indeed, the government conceded during oral argument that such a sweeping rule is not legally supported:

> [Court:] Where is the holding that only fair market value is probative evidence?
>
> [Government:] I don't think that what the court has held is that only fair market value is probative evidence.

Oral Arg. at 19:44, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-1277.mp3.

We are guided by the Supreme Court's cautions against rigidity in this area of the law.  *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31–32 (2012) ("[N]o magic formula enables a court to judge, in every case,

whether a given government interference with property is a taking. . . . [M]ost takings claims turn on situation-specific factual inquiries."). To that end, it is clear that courts must have flexibility to determine in each individual case how to most accurately measure the economic value of what a takings claimant actually lost due to the governmental action. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 295 (1981) ("These 'ad hoc, factual inquiries' must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979)).

In the context of the very Preservation Statutes that are at issue in this case, this court has previously outlined two possible approaches to measuring the economic impact suffered by property owners who were deprived of their prepayment options. *Cienega X*, 503 F.3d at 1282.

(1) In the first approach, "a comparison could be made between the market value of the property with and without the restrictions on the date that the restriction began (the change in value approach)." *Id.*

(2) The second approach is to "compare the lost net income due to the restriction (discounted to the present value at the date the restriction was imposed) with the total net income without the restriction over the entire useful life of the property (again discounted to present value)." *Id.*

The court in *Cienega X* emphasized that "[n]either approach appears to be inherently better than the other." *Id.* Yet, in this case, the Claims Court concluded that only the first of *Cienega X*'s two approaches—*i.e.*, the change in value approach—was permissible for the FWPs. *Decision*, 140 Fed. Cl. at 80. We conclude that the Claims Court erred in that respect.

The Claims Court placed significant emphasis on its finding that the takings in this case are in the nature of "permanent" takings rather than "temporary" takings. *See id.* at 79–86. And, to be clear, *Cienega X* did begin its endorsement of its two possible approaches by noting that it was "in a temporary taking situation." *Cienega X*, 503 F.3d at 1282 (citing *Rose Acre Farms Inc. v. United States*, 373 F.3d 1177, 1188 (Fed. Cir. 2004)). But *Cienega X* also concluded that "in a temporary regulatory takings analysis context the impact on the value of the property as a whole is an important consideration, just as it is in the context of a permanent regulatory taking." *Id.* at 1281.

We recognize that the distinction between temporary and permanent takings can affect the economic impact analysis. *See, e.g.*, *CCA*, 667 F.3d at 1246 (considering the temporary takings claims of developers who retained their properties and had their prepayment options restored by the HOPE Act); *Cienega X*, 503 F.3d at 1287–88 (discussing need to consider duration of regulation's effect on plaintiffs when assessing takings claims and noting differences in effective duration of LIHPRHA legislation between HOPE Act and LIHPRHA use agreement plaintiffs). But we see no meaningful reason why the distinction between temporary and permanent takings should affect which *method* is appropriate to measure economic impact in any given case—*i.e.,* the choice of which equation to use in the first place. Regardless whether a taking is permanent or temporary in nature, there is no one-size-fits-all method for measuring the economic impact of a governmental action. *See Hodel*, 452 U.S. at 295.

In this case, the properties at issue were income-producing properties. The value of each property to its respective owner derived, not from any inherent objective "fair market value" of the land or the fixtures on the property, but rather from the property's ability to generate a future stream of rental income as of the prepayment date. *See* J.A. 3810 (Dr. Wade's qualitative description of what the

FWPs lost due to the Preservation Statutes). The FWPs have consistently argued that lost future rental income, rather than fair market value, is the appropriate measure of economic impact because that is what the government actually took from them. The FWPs' position is that a change in fair market value approach would not accurately account for the fact that the governmental action targeted their "going business concerns." *See* Appellants Br. 226.

We agree with the FWPs that, consistent with the second approach in *Cienega X*, they may attempt to prove the economic impact of the Preservation Statutes on their property interests by demonstrating their lost opportunity to earn market-rate rental income after prepaying their mortgages. That is what Dr. Wade did in his expert report. Dr. Wade first determined FWPs' "lost net income due to the restriction," *Cienega X*, 503 F.3d at 1282, by taking the net present value of the FWPs' future rental income without the Preservation Statutes and subtracting it by the actual income that each FWP earned from the sale of its property (or, in the case of Rock Creek, the low-income housing rental income earned under its LIHPRHA use agreement). J.A. 3810–22. Dr. Wade then "compare[d] the lost net income due to the restriction . . . with the total net income without the restriction," *Cienega X*, 503 F.3d at 1282, by dividing the lost net income by the net present value of the future rental income. J.A. 3810–22. Thus, Dr. Wade's approach was in accordance, at least broadly speaking, with a method for measuring economic impact that this court has expressly endorsed.

The Claims Court never wavered from its initial conclusion that the one, and only one, way that Dr. Wade was allowed to measure economic loss in this case was by comparing fair market values. That initial conclusion resulted in, what the FWPs' counsel accurately termed, "a series of cascading errors" that led to the court's finding that Dr. Wade's entire expert report was nonprobative. Oral Arg.

at 38:20.  That erroneous finding cannot support the court's grant of summary judgment.

## B

Next, we turn to the Claims Court's conclusion that Dr. Wade's analysis contained two additional flaws that were contrary to binding precedent and thus rendered his opinions nonprobative.  *Decision*, 140 Fed. Cl. at 92 ("Dr. Wade's methodology is not probative as to economic injury, or the severity of economic injury.").  The Claims Court characterized the two flaws as (1) the "parcel as a whole" concept and (2) economic loss severity measures.  *See id.* at 90–91.  We address each of those alleged flaws in turn.

## 1

The Claims Court concluded that "Dr. Wade's approach is inconsistent with the parcel as a whole teaching of *Cienega X*."  *Id.* at 91; *Cienega X*, 503 F.3d at 1280 ("[T]he correct approach is to consider the 'parcel as a whole.'") (citing *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 643–44 (1993)).  The court took issue, in particular, with Dr. Wade's statement that the economic impact was "benchmarked . . . to the owners' equity at stake."  *Decision*, at 91 (quoting Plaintiffs' Appendix at 253, *Anaheim Gardens v. United States*, 140 Fed. Cl. 72 (2018) (No. 1:93-cv-00655), ECF No. 441-4).  The court raised two concerns with that benchmarking approach.

The Claims Court's first concern with Dr. Wade's benchmarking was that he supposedly "substitute[d] the owner's equity portion of the entire property for the parcel as a whole."  *Decision*, 140 Fed. Cl. at 91.  The government, in its brief, similarly accuses Dr. Wade of using the equity as the denominator of his equation.  *See* Appellee Br. 16.  But the Claims Court and the government appear to have misunderstood Dr. Wade's analysis.  Dr. Wade used a *net* present value as the denominator of his equation, with "net

present value" representing "present value" of future cash flows *subtracted by* "equity." Thus, not only did Dr. Wade not substitute the equity for the parcel as a whole in the denominator, he actually subtracted the equity out of the denominator. Dr. Wade's report explains that he used net present value because it "provides absolute measures of the dollar amounts at stake in the litigation." J.A. 3811. While we are not in position to decide whether Dr. Wade's decision to use net present values was sound under principles of economics, we do not agree with the Claims Court that his approach failed to consider the parcel as a whole.

The Claims Court's second concern with Dr. Wade's benchmarking was that he reduced the denominator in his equation and thus inflated the economic impact. *Decision*, 140 Fed. Cl. at 91. But every choice by an expert to use one input over another will necessarily increase or decrease the final number. The mere fact that Dr. Wade used a lower denominator and thus calculated a higher loss percentage does not, in itself, mean that his calculations were incorrect or improper. Again, questions remain as to whether Dr. Wade's methodology was consistent with principles of economics and whether his explanation for using that approach is credible. But those are not questions that we can resolve on appeal, nor are they questions that the Claims Court should resolve on summary judgment. Rather, the Claims Court should consider the admissibility of Dr. Wade's expert analysis under the Federal Rules of Evidence and, at trial, evaluate his credibility and persuasiveness when he explains why he used net present values.

Finally, even if the Claims Court were to conclude that Dr. Wade's decision to subtract equity was problematic—a conclusion that the court cannot have yet reached—we note that Dr. Wade's expert report is likely still probative of economic impact. To illustrate, Dr. Wade presented an economic loss equation and used net present values as inputs to that equation. The economic loss equation itself appears to be unchallenged, but the Claims Court has suggested

that perhaps Dr. Wade should have used present values as inputs. Either way, Dr. Wade's report includes both sets of possible inputs because before he calculated the net present values, he had to first determine the present values of the future income streams at the prepayment date for each of the properties. *See, e.g.*, J.A. 3897 (calculating the present value for Cedar Gardens at the prepayment date to be $6,810,385). Thus, Dr. Wade's expert report provides the relevant equation and all possible inputs for that equation.

Ultimately, the Claims Court's concerns about Dr. Wade's benchmarking do not support a grant of summary judgment. There are evidentiary issues that the Claims Court has not yet considered as well as genuine issues of fact regarding Dr. Wade's decision to use net present values in his calculations. On the record presented, we do not agree with the Claims Court that Dr. Wade's benchmarking approach renders his opinions entirely nonprobative of economic impact.

2

The Claims Court also concluded that Dr. Wade's opinions about economic severity were illogical and unhelpful, mostly because they resulted in calculated losses that were larger than the appraisal values that determined the sale price under LIHPRHA. *See Decision*, 140 Fed. Cl. at 91–92. For that conclusion, the court cited *Cienega X*, where this court took issue with a damages award that was higher than the appraised value of the property. *Cienega X*, 503 F.3d at 1282 n.13 ("A determination that damages exceed the value of the property should be indicative that the method of computing damages is flawed.").

As this court stated in *Cienega X*, "[l]ogically speaking, the government cannot take more than what the plaintiffs actually possess." *Id.* But that footnoted statement was in the context of a post-trial damages award that exceeded the amount of an unchallenged appraisal. *Id.* Here, in contrast, the FWPs do not concede that the appraisal values

accurately represent the value of the properties they actually possessed. Thus, our dictum in *Cienega X* does not preclude a finding in this case that the actual economic loss suffered by the FWPs could have been larger than the appraisal values of their properties.

The Claims Court explicitly acknowledged that Dr. Wade disputed the accuracy of the appraisals. *Decision* 140 Fed. Cl. at 90 n.12 (citing Dr. Wade's expert report). And the court recognized that Dr. Wade's methodology could be justified "if he persuasively explained why the LIHPRHA FMV appraisal[s] grossly undervalue[] [the properties]." *Id.* at 92. The court simply did not find his explanation "persuasive." *See id.* But the persuasiveness of an expert's explanation is not an issue to be weighed by the court on summary judgment. *See Jay v. Sec'y of Dep't of Health & Human Servs.*, 998 F.2d 979, 982 (Fed. Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The government argues that Dr. Wade has not presented an alternative fair market value and has only argued that the process cannot yield a fair market value at all. Oral Arg. at 32:15. Regardless, Dr. Wade's expert report sets forth his opinion that the appraisal values did not accurately reflect the full values of the properties. *See Decision*, 140 Fed. Cl. at 90 n.12. Moreover, the FWPs have clearly asserted their position that the appraisals are poor proxies for the actual losses that they suffered in this case. *See, e.g.*, Oral Arg. at 39:05. At the very least, because there is no dispute that "the fair market value of income-producing property reflects and includes the value of income that might be realized from the property," *Decision*, 140 Fed. Cl. at 80 (citing *First Fed. Lincoln Bank v. United States*, 518 F.3d 1308, 1317 (Fed. Cir. 2008)), Dr. Wade's opinions regarding lost income inherently reflect his view that the appraisals did not accurately account for the value of the income-producing properties in this case.

For the foregoing reasons, we do not agree with the Claims Court that Dr. Wade's calculation of losses greater than the appraisal values is necessarily illogical and unhelpful. Because there are unresolved fact questions regarding the accuracy of the appraisals and the proper measure of the FWPs' losses, the economic severity issue does not support the Claims Court's grant of summary judgment.

C

Lastly, we address the government's proposed alternative ground for affirmance on the basis that Dr. Wade used data that post-dated the alleged taking. The government argues that Dr. Wade should have restricted his analysis to the data that were available to the parties (*i.e.*, the developers and the government) at the date of the taking, which in this case is the prepayment date for each of the properties. The government cites the "settled principle in takings law that the proper date for valuing the property allegedly taken . . . is the date on which the taking allegedly occurred." Appellee Br. 20 (citing Supreme Court and Federal Circuit precedent).

The FWPs respond that the law requires that the future values of their losses be discounted to the relevant prepayment date for each property, which is what Dr. Wade did. Reply Br. 15–16. They argue that, not only are *ex post* data allowed to be used in measuring economic impact, they are in fact the best measure to ensure that FWPs receive compensation for the full extent of the takings. *Id.* at 16–17.

We agree with the FWPs. We do not find a basis in the law to categorically favor the use of outdated *ex ante* forecasts or projections over verifiable real-world *ex post* data. While *ex ante* data may be preferable in some cases for policy reasons (*e.g.*, to avoid "*post hoc* fluctuations," *see* Appellee Br. 22), the Claims Court must decide based on the facts and circumstances at issue whether this is such a case. As

the Claims Court did not reach that issue and we cannot decide it in the first instance on appeal, we reject the government's proposed alternative ground for affirmance based on Dr. Wade's use of *ex post* data.

### CONCLUSION

For the foregoing reasons, we affirm the Claims Court's grant of summary judgment with respect to Su Casa. With respect to the remaining FWPs, we vacate the Claims Court's grant of summary judgment and remand for further proceedings.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**